387 S.E.2d 288

**Richard W. ADAMS and Sandra Adams—Appellees,**

**v.**

**NISSAN MOTOR CORPORATION IN U.S.A.—Appellant.**

**Richard W. ADAMS and Sandra Adams—Appellants,**

**v.**

**NISSAN MOTOR CORPORATION IN U.S.A.—Appellee.**

**No. 19041, 19130.**

Supreme Court of Appeals of West Virginia.

Nov. 3, 1989.

---

**3.** Similar sentiments were expressed in *Paul* and *Perkins v. Doe,* 177 W.Va. 84, 350 S.E.2d 711 (1986).

Ralph C. Young, Hamilton, Mooney, Burgess, Young & Tissue, Oak Hill, for Richard and Sandra Adams.

Anita R. Casey, Meyer, Darragh, Buckler, Bebenek, Eck and Hall, Charleston, for Nissan Motor Corp. in U.S.A.

BROTHERTON, Chief Justice:

These joint appeals present novel issues regarding the interpretation of W.Va.Code § 46A–6A–1 *et seq.* (1986), the West Virgi-

nia lemon law statute. Specifically, Nissan Motor Corporation appeals the Fayette County jury's finding that their Security Plus Agreement constituted an express warranty for the purposes of the statute and thus extended the period under which a purchaser could prove a lemon law case. The Adams' also appeal, contending that they are entitled to both "post-verdict damages" and a cause of action as a private attorney general to act against Nissan. Although we find the Security Plus Agreement was not a warranty, we affirm the decision of the Fayette County Circuit Court for the reasons stated below and dismiss the Adams' appeal as meritless.

The Adams, plaintiffs below, purchased a 1986 Nissan 4 × 4 truck on October 31, 1986, from Derald Rollyson, Inc. of Beckley, West Virginia, for $15,854.90 plus tax, title, and registration. At the time of the purchase, the Adams also purchased a Nissan Security Plus Agreement at the cost of $519.75 over and above the purchase price of the vehicle. The Security Plus Agreement provided free repairs to the Nissan truck for five years or 60,000 miles, which was over and above the standard express warranty on the truck of twelve months/12,500 miles, or twenty-four months/25,000 miles for powertrain repairs. The Security Plus Agreement also included the cost of a rental car during any repairs incurred during the 60,000 mile period.

In January, 1987, when the vehicle odometer read approximately 7,495 miles, it was returned to Rollyson Motors for correction of problems with the left front hub. The hub on this model truck allows a shift into four-wheel drive while the truck is moving. After service, no further repairs were attempted on the alleged hub problem during the express warranty period. However, the Adams contend that the hub was never completely repaired and currently they cannot shift into four-wheel drive unless the truck stops completely.

The second complaint was made in September, 1987, when a sway bar bushing and bracket went bad. Repairs were effected on September 18, 1987, when the vehicle had 20,899 miles. Following the repair, no further problems were reported with the sway bar bushing and bracket.

The next problem complained of by the Adams occurred in January, 1988, when the vehicle had mileage of 29,000 miles on it, over and above both express warranties. There does not seem to be any dispute that the repairs were made without cost to the plaintiffs below under the Security Plus Agreement.

The plaintiffs filed suit in May, 1988. The Adams contended that, pursuant to W.Va.Code § 46A–6A–1 et seq., their Nissan 4 × 4 truck failed to conform with the warranties provided by Nissan, and that after a reasonable number of attempts to repair the vehicle, the petitioner was unable to conform the subject vehicle to the warranties. Therefore, the Adams sought:

1. Revocation of acceptance and a refund of the purchase price of the vehicle, including sales tax, license, registration, and other reasonable expenses incurred in the purchase of a new vehicle and interest thereon;

2. Damages for the cost of repairs allegedly required to conform the vehicle to the express warranty;

3. Damages for loss of use, annoyance, and inconvenience resulting from the alleged nonconformity, including expenses for replacement transportation; and

4. Reasonable attorney fees.

Prior to trial, Nissan presented a motion in limine to exclude during trial any evidence of the alleged damages, defects, problems, and/or repairs to the Nissan truck which occurred outside the manufacturer's express warranty periods of 12 months/12,500 miles or 24 months/25,000 miles for powertrain repairs as provided by W.Va.Code §§ 46A–6A–3 and 5. By contrast, counsel for the Adams argued that the Nissan Security Plus Agreement extended the manufacturer's express warranty to a period of 5 years/60,000 miles, thus permitting the introduction of evidence of repairs beyond the standard warranty periods. The circuit court reserved ruling on

the motion until hearing the evidence in the case.

During the trial, Mr. Adams testified about alleged defects which occurred when the vehicle had in excess of 25,000 miles. After objection by Nissan's counsel, the court ruled that it would leave to the jury the issue of whether the Nissan Security Plus Agreement was a warranty which extended the applicability of the lemon law statute to the respondent's truck. Nissan objected to the judge's ruling.

Following the close of the evidence, the jury returned a verdict finding that there was a nonconformity with the written warranty that substantially impaired the use and market value of the vehicle. Therefore, the jury awarded $21,500 for revocation of the purchase price, and vehicle and incidental expenses, including $2,500 for annoyance and inconvenience and $2,500 for loss of use.[1]

On November 16, 1988, Nissan moved to have the jury verdict set aside. On November 29, 1988, the motion for a new trial was denied. Nissan appeals from that order, primarily alleging that the trial court erred in permitting the jury to make the determination of whether the Security Plus Agreement was a warranty and that the Security Plus Agreement was not a warranty, but rather a service contract. Simultaneously, the Adams appealed, contending they had the right to obtain "post-verdict damages" while this appeal was pending and to act as a private attorney general to levy civil fines against Nissan for failure to disclose the availability of lemon law options to the consumer.

## I.

Lemon law statutes developed as a logical extension of the federal Magnuson–Moss Warranty–Federal Trade Commission Improvement Act, which was created by Congress to deal with problems inherent in consumer warranties.[2] Contrary to popular belief, the Magnuson–Moss Act does not require a seller to give a warranty. Rather, it is applicable in situations not otherwise controlled by statute only when a "warrantor" offers a written warranty on a "consumer product" to a "consumer."[3] Section 2302 of the Act generally requires that the terms and conditions of the warranty, if offered, must be expressed in "simple and readily understood language";[4] that when offered, full warranties must meet certain requirements, including full refund or free replacement if the product continues to malfunction after failure of a reasonable attempt to fix the defect;[5] and that when offering a full warranty, the manufacturer may not attempt to limit that warranty.[6] Thus, if a "full" warranty is limited in any manner, it must

---

1. The jury also answered special interrogatories regarding their findings:

   1. Do you find that the defects now complained of by the plaintiffs occurred during the twelve month/12,000 mile manufacturer's express warranty?
   X Yes ___ No
   2. Do you find that the defects now complained of by the plaintiffs occurred during the twenty-four month/25,000 mile manufacturer's express warranty?
   X Yes ___ No
   3. Do you find that the defects now complained of by the plaintiffs occurred during the sixty month/60,000 mile Nissan Security Plus Agreement purchased by the plaintiffs?
   X Yes ___ No
   4. Do you find that the Nissan Security Plus Agreement was a:
   A. Service contract ___
   or
   B. Warranty X

2. 15 U.S.C.A. §§ 2301–2312 (West 1982). The passage of the Magnuson–Moss Act appears to be the result of extensive study of the numerous problems with consumer warranties, including inadequate coverage and difficulty in obtaining warranty repairs. *See* Brickey, *The Magnuson–Moss Act—An Analysis of the Efficacy of Federal Warranty Regulation as Consumer Protection Tool,* 18 Santa Clara L.Rev. 73 (1978); Denicola, *The Magnuson–Moss Warranty Act: Making Consumer Product Warranty a Federal Case,* 44 Fordham L.Rev. 273 (1975); Miller and Kanter, *Litigation Under Magnuson–Moss: New Opportunities in Private Action,* 13 U.C.C.L.J. 10 (1980).

3. 15 U.S.C.A. § 2302 (West 1982).

4. 15 U.S.C.A. § 2302(a) (West 1982).

5. 15 U.S.C.A. § 2304 (West 1982).

6. 15 U.S.C.A. § 2303, 2308 (West 1982).

be labeled a limited warranty.[7]

While similar in intent, lemon law statutes are specially designed to remedy the problem of new motor vehicle warranties.[8] Much more specific and remedy-oriented than the Magnuson–Moss Act, a majority of the states have enacted some version of the original Connecticut New Motor Vehicle Warranty statute to date.[9]

The West Virginia lemon law statute, W.Va.Code § 46A–6A–1 *et seq.* (1986), entitled "Consumer Protection—New Motor Vehicle Warranties," explains that the public policy behind the lemon law statute is to place upon the manufacturer of motor vehicles "the duty to meet their obligations and responsibilities under the terms of the express warranties extended to the consumers of this State." W.Va.Code § 46A–6A–1(1) (1986). Thus, West Virginia Code § 46A–6A–3 establishes the manufacturer's duty to repair or replace a new motor vehicle. Specifically, the Code provides that:

> (a) If a new motor vehicle purchased in this State on or after [January 1, 1984] does not conform to all applicable express warranties and the consumer reports the nonconformity to the manufacturer, its agent or its authorized dealer during the term of the express warranties or during the period of one year following the date of the original delivery of the new motor vehicle to a consumer, whichever is the later date, the manufacturer, its agent or its authorized dealer shall make the repairs necessary to conform the vehicle to the express warranties, notwithstanding the fact that the repairs are made after the expiration of the warranty term.

> (b) If the manufacturer, its agents or its authorized dealer are unable to conform the new motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use or market value of the motor vehicle to the consumer *after a reasonable number of attempts,* the manufacturer shall replace the new motor vehicle with a comparable new motor vehicle which does conform to the warranties. (Emphasis added.) [10]

West Virginia Code § 46A–6A–5 then defines "a reasonable number of attempts" which must be undertaken by the manufacturer before the manufacturer is liable to replace the new motor vehicle.

> (a) It is presumed that a reasonable number of attempts have been undertaken to conform a new motor vehicle to the applicable express warranties, if the same nonconformity has been subject to repair three or more times by the manufacturer, its agents or its authorized dealers within the express warranty term or during the period of one year following the date of original delivery of the motor vehicle to the consumer, whichever is the earlier date, and the nonconformity continues to exist, or the vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days during the term or during the one-year period, whichever is the earlier date.

> (b) If the nonconformity results in a condition which is likely to cause death or serious bodily injury if the vehicle is driven, it is presumed that a reasonable number of attempts have been undertaken to conform the vehicle to the applicable express warranties if the nonconformity

---

7. *See also* Bixby, *Judicial Interpretation of the Magnuson–Moss Warranty Act,* 22 Am.Bus.L.J. 125 (1984–5).

8. Lemon law statutes appear to be direct descendants of 15 U.S.C.A. § 2304, requiring full refund or free replacement if the product continues to malfunction after a failed attempt at repair.

9. Comment, *Ohio's Lemon Law: Ohio Joins the Rest of the Nation in Waging War Against the Automobile Limited Warranty,* 57 Cinn.L.Rev. 1015, 1016–17 (1989).

10. The parties do not argue, nor do we address, the difference in the time periods referred to in W.Va.Code §§ 46A–6A–3 and 5. West Virginia Code § 46A–6A–3 provides that a consumer must report the nonconformity "during the term of the express warranties or during the period of one year following the date of the original delivery ... *whichever is the later date....*" (Emphasis added.) By contrast, W.Va.Code § 46A–6A–5 requires that *"the earlier date"* be used as the operative date. (Emphasis added.)

has been subject to repair at least once by the manufacturer within the express warranty term or during the period of one year following the date of original delivery of the motor vehicle to a consumer, whichever is the earlier date, and the nonconformity continues to exist.

\* \* \* \* \* \*

■ We believe that W.Va.Code §§ 46A–6A–3 and 5 must be read in pari materia: if the consumer can show a defect or condition "which substantially impairs the use or market value of the motor vehicle to the consumer after a reasonable number of attempts," then the court's attention shifts to W.Va.Code § 46A–6A–5 to determine what is considered to be "a reasonable number of attempts" by the manufacturer or dealer necessary to conform the motor vehicle to the applicable express warranties.[11] Section 5 presumes that if it is a dangerous defect likely to cause "death or serious bodily injury," then one failed attempt by the manufacturer or dealer to repair the defect, within the earlier of the express warranty period or one year, is sufficient to satisfy W.Va.Code § 46A–6A–3(b) and require the manufacturer to replace the flawed vehicle with a comparable new motor vehicle which conforms to the applicable warranties.

■ However, if the defect is not one likely to cause death or serious bodily injury, then it is presumed that a reasonable number of attempts to fix the vehicle have been undertaken if the same defect has been subject to repair three or more times by the manufacturer or the dealer within the express warranty term or one year, whichever is the earlier date. W.Va.Code § 46A–6A–5(a). Applying this Code section to the current facts, it is clear that no one

defect in the Adams' Nissan 4 × 4 truck was subject to repair three or more times during either the one-year period or the expiration of the 12,500 mile express warranty period.[12] Nor do we find a dangerous defect likely to cause "death or serious bodily injury" within the express warranty period or one year. The evidence is uncontroverted that the only repairs within the first year were one attempt to fix the four-wheel-drive left hub and the repair of the sway bar bushing and bracket. No further attempts to repair the hub were made within the one-year period and, for that reason, the Adams' argument fails.

■ Under the foregoing analysis, our characterization of the Security Plus Agreement as either a warranty or a service contract is irrelevant. Even if the Security Plus Agreement was considered to be a warranty, the one-year period would still be the earlier date as compared with the express warranty term discussed in subsection 5. However, for purposes of further reference, we hold that the Security Plus Agreement is a service contract and not a warranty as intended by W.Va. Code § 46A–6A–5. West Virginia Code § 46A–6A–2(3) defines the "manufacturer's express warranty" and "warranty" to mean "the written warranty of the manufacturer of a new motor vehicle of its condition and fitness for use, including any terms or conditions precedent to the enforcement of obligations under that warranty...." A brief perusal of the actual Security Plus Agreement document reveals that it fails to provide any warranty for fitness for use or the vehicle's condition. Instead, it merely provides for the repair of the vehicle without cost in the event of the mechanical breakdown of certain covered parts listed in the service agreement. In

---

**11.** We emphasize that both steps in this two-step analysis are important. If the nonconformity complained of is minor—it does not substantially impair the use or market value of the vehicle to the consumer—then the analysis fails and the court should not proceed to the second step found in W.Va.Code § 46A–6A–5.

**12.** The vehicle, bought on October 31, 1986, had 29,872 miles on the odometer when brought in for service in January, 1988, over and above the one-year period and both express warranty peri-

ods. However, since there is no definitive record of the mileage in October or November, 1988, we do not know which was the earlier date, the expiration of the one-year period or the express warranty term. In any event, it is irrelevant to this analysis since the repairs in question occurred well out of the one-year period and both express warranty periods. For ease of reference, however, we will consider the one-year period to be the earlier date.

fact, the terms of the agreement cautions that "[t]his is only a service agreement designed to afford the purchaser with reasonable repair or replacement of the listed parts to the described vehicle. It is not a condition of the sale of the vehicle." We find nothing in the Security Plus Agreement which would justify its characterization as a warranty of any sort.

Our interpretation of the Security Plus Agreement is bolstered by the Seventh Circuit opinion in *Skelton v. General Motors Corp.*, 500 F.Supp. 1181 (N.D.Ill.1980), *rev'd* 660 F.2d 311 (7th Cir.1981), *cert. denied*, 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982). *Skelton* involved a suit by consumers against General Motors filed because of the automaker's substitution of transmissions different from those advertised in brochures distributed to the prospective buyers of that vehicle. After analyzing the Magnuson–Moss Act, the district court concluded that although the Magnuson–Moss Act applied only to transactions involving "written, usually formal warranties," if a written warranty was used, then "[o]ther written promises presented in connection with the same transaction should also be enforceable as part of the written warranty." 500 F.Supp. at 1190. On appeal, the Seventh Circuit reversed the decision. After again reviewing the Magnuson–Moss Act, the Seventh Circuit concluded that the written warranty did not extend to an "undefined 'document' or 'pile of written documents,' as urged by the district court," but was limited to the definition of "written warranties" found in 15 U.S.C.A. § 2301(6). 660 F.2d at 322. By analogy, we believe in this case that only the documents which are part of the actual written warranty should be considered part of the warranty for purposes of the West Virginia lemon law statute.

■ Although we have ruled that the Adams failed to satisfy the terms of W.Va. Code § 46A–6A–5(a) because the same defect had not been subject to repair three or more times within one year from the original delivery, we find that, under the same Code section, the vehicle was out of service by reason of repair for a cumulative total of thirty or more calendar days during both the express warranty term and the one-year period. W.Va.Code § 46A–6A–5(a). Although the facts surrounding the actual out-of-service dates are in dispute, the jury believed the testimony that the vehicle was out of service for twenty-four days and seventeen days during two separate periods of time, for a cumulative total of more than thirty calendar days during the one-year period. Consequently, we affirm the verdict of the Fayette County Circuit Court.

## II.

■ We next address the issues presented in the Adams' cross appeal, contending that they are entitled to "post-verdict damages," including the cost of the car payment and the continued loss of use, annoyance and inconvenience. The Adams, however, are unable to cite any case law in support of this novel theory.

One of the basic premises of our legal system is that prior to any verdict and subsequent award of damages, absent an administrative alternative, a defendant is entitled to a trial either by the court or by jury. Article III, § 13 of the West Virginia Constitution provides a constitutional right to trial by jury before deprivation of one's property can occur.

> In suits at common law, where the value in controversy exceeds $20 exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved; and in such suit in a court of limited jurisdiction a jury shall consist of six persons. No fact tried by a jury shall be otherwise reexamined in any case than according to rule of court or law.

Similarly, the Seventh Amendment to the United States Constitution provides for a right to trial by jury when the amount in controversy exceeds $20.[13]

---

**13.** The Seventh Amendment to the United States Constitution states "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...."

Recently, in *Bishop Coal Co. v. Salyers*, 181 W.Va. 71, 380 S.E.2d 238 (1989), the Court held that "the great weight of authority is that substantial money to compensate for pain, suffering, humiliation, economic losses other than wages, and punitive damages cannot be awarded without a jury." *Id.* 181 W.Va. at 76, 380 S.E.2d at 243. "[W]hen an individual seeks substantial money damages as compensation for pain and suffering, the individual's role in enforcement of the 'public rights' is minor and the narrow exception to the requirement of a jury trial does not apply." *Id.* 181 W.Va. at 78, 380 S.E.2d at 245. Consequently, the Court held that to allow the Human Rights Commission "to award money other than limited incidental damages, without a jury, would violate W.Va. Const., art. III, § 13." *Id.* 181 W.Va. at 79, 380 S.E.2d at 246.[14]

Therefore, the defendants below are entitled to a trial by jury before damages can be awarded. Moreover, to ask the sitting jury in the initial trial to award prospective actual damages and damages for annoyance and inconvenience pending the outcome of a possible appeal is impermissibly speculative. It is an accepted fact in civil litigation that the losing party has the right to appeal the verdict, thus staying the payment of any judgment won. The plaintiffs below cannot claim undue hardship after the fact since they should have been aware, through their attorney, of the possibility of appeal. Moreover, we note that they are entitled to post-judgment interest on that amount at a statutory rate of interest, not only on the out-of-pocket amount awarded for the vehicle, but also on the amount awarded for annoyance, inconvenience, and loss of use. West Virginia Code § 56–6–31 (1989) provides that "[e]xcept where it is otherwise provided by law, every judgment

or decree for the payment of money entered by any court of this State shall bear interest from the date thereof,...." As the legislature intended that post-judgment interest be available to compensate an individual for the delay between the judgment and the receipt of actual payment, the Adams are not without recompense for the amounts expended during the pendency of the appeal.

■ The Adams next contend that they have standing to act as a private attorney general to seek civil penalties against Nissan for violation of the consumer disclosure provisions of the State lemon law. They argue that, because W.Va.Code § 46A–6A–9 provides that "[n]othing in this article shall be construed to limit any right or remedy which is otherwise available to a consumer or authorized dealer o[r] a manufacturer under any other law," they are entitled to seek civil penalties against Nissan for failure to disclose the availability of a lemon law replacement according to W.Va.Code § 46A–6A–6. Further, they do not believe that they should have to wait for the State attorney general to pursue Nissan for any willful violations of the Code, as required in W.Va.Code § 46A–6A–8.

We find this argument to be specious and their belief that *Jenkins v. J.C. Penney Casualty Ins. Co.*, 167 W.Va. 597, 280 S.E.2d 252 (1981) supports their position to be erroneous. Although the Court in *Jenkins* accepted the fact that there could be an implied cause of action for a statutory violation, we note that *Jenkins* involved a statute which did not provide for a specific civil remedy. In the case now before us, we believe there are adequate remedies at law, both privately for the consumer to obtain a replacement motor vehicle, costs, and damages for loss of use, annoyance,

---

**14.** In *Bishop*, we pointed out that:
Both the federal and state constitutional jury trial provisions grant the right to a jury trial "in suits at common law." Suits in equity were tried without juries. After the merger of law and equity (in 1938 in the federal courts), many cases contain both legal and equitable elements, usually in the form of the action or the relief sought. Under the circumstances, the Supreme Court has given an expansive reading of the seventh amendment. *See Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (jury trial right in a case involving two discreet claims, one of which was triable by a jury); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (jury trial right where the claim contained both legal and equitable issues).... *Id.* 181 W.Va. at 77, 380 S.E.2d at 244.

and inconvenience, and officially with enforcement by the State attorney general.

Moreover, even if we assume, as the Adams' contend, that *Hurley v. Allied Chemical Corp.*, 164 W.Va. 268, 262 S.E.2d 757 (1980), would allow a private cause of action, this premise is defeated by its own test. The *Hurley* Court allowed a private cause of action under the following circumstances:

> The following is the appropriate test to determine when a State statute gives rise by implication to a private cause of action: (1) the plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government.

*Id.* at syl. pt. 1. We can find no legislative intent, either express or implied, which would lead us to believe that the legislature intended to vest the consumer with a private cause of action against the manufacturer or dealer other than that already provided by statute. Furthermore, a private cause of action would be in conflict with the underlying purpose of the legislative scheme, which is to provide repair or replacement of the vehicle for the consumer. Nowhere in the statute do we find the intent by the legislature to allow the consumer to act as a vigilante when the authority is properly vested in the State attorney general. W.Va.Code § 46A–6A–8 (1986).

Consequently, for the reasons explained above, we dismiss the Adams' appeal, agree in part with Nissan's appeal, and affirm the opinion of the Fayette County Circuit Court on other grounds.

Affirmed.