**LIBERTY LINCOLN–MERCURY, INC., Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

Civil Action No. 96–6037(MTB).

United States District Court, D. New Jersey.

May 28, 1998.

Eric Lewis Chase, Bressler, Amery & Ross, Morristown, NJ, Norman I. Klein, Carlet, Garrison & Klein, Clifton, NJ, for Plaintiff.

Dennis Richard La Fiura, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Defendant.

*OPINION*

BARRY, District Judge.

This matter comes before the court upon the motion of plaintiff Liberty Lincoln–Mercury, Inc. ("Liberty") for summary judgment pursuant to Fed.R.Civ.P. 56(a) and the cross-motion of defendant Ford Motor Company ("Ford") for summary judgment pursuant to Fed.R.Civ.P. 56(b). The court has reviewed the submissions of the parties without oral argument pursuant to Fed.R.Civ.P. 78. For the reasons discussed below, plaintiff's mo-

tion will be denied and defendant's cross-motion will be granted.

In this, the third round in a series of lawsuits involving these parties, Liberty asks this court to further test the boundaries of N.J.S.A. 56:10–15 (the "Automobile Warranty Reimbursement Act" or the "Act"), which regulates the amount of reimbursement an automobile manufacturer must pay its dealers for repairs made pursuant to the manufacturer's warranty, and under which Liberty was granted relief by this court approximately two years ago.[1] In this round, however, rather than seeking redress under the statute with respect to repairs made pursuant to Ford's new car "warranty," Liberty asks the court to apply the same statutory framework to repairs made pursuant to Ford's "extended service plan contracts," otherwise known as "ESPs."

The competing motions raise one core issue: whether Ford's ESPs should be considered "warranties" as that term is used in N.J.S.A. 56:10–15. If so, argues Liberty, Ford's refusal to pay ESP claims at retail violates the warranty reimbursement and prohibited practices provisions of the Act. If not, argues Ford, the provisions of the parties' Sales and Service Agreements—and lower reimbursement rates—control. Because this issue is narrowly focused and the facts surrounding the matter have, in large part, already been set forth by this court in *Liberty Lincoln–Mercury, Inc. v. Ford Motor Company*, 923 F.Supp. 665 (D.N.J.1996), *aff'd in part, rev'd and vacated in part on other grounds*, 134 F.3d 557 (3d Cir.1998), the court's discussion of the facts herein will be brief and limited to the issue at hand.

## I.

Ford manufactures motor vehicles, including Lincoln and Mercury vehicles, which are sold to a nationwide network of authorized dealers, including Liberty. *Amended Complaint* at ¶¶ 10, 12. The parties' relationship

is governed by a Lincoln Sales and Service Agreement and a Mercury Sales and Service Agreement (collectively the "Sales and Service Agreements"). *Id.* at ¶ 13; *Certification of Robert X. Robertazzi ("Robertazzi Cert.")*, Exhibits A–C. Each new vehicle Ford sells to its dealers for resale to consumers carries with it a standard written Ford new vehicle limited warranty, *Affidavit of Bruce L. Ayres ("Ayres Aff.")* at ¶ 2, which contains a bumper to bumper warranty, as well as separate warranties covering items such as safety restraints, corrosion, federal emissions control systems, and noise emissions (collectively the "limited warranty"). *See Ford's 1996–Model Warranty Informational Booklet* annexed to *id.*, Exhibit A.

The bumper to bumper warranty provides that "[a]uthorized Ford dealers will repair, replace or adjust all parts of your vehicle (except tires) that are defective in factory-supplied materials or workmanship for 3 years or 36,000 miles (whichever occurs first)." *Id.*, Exhibit A at 5. The safety restraints and corrosion warranties provide similar language, albeit with varying warranty lives. *Id.*, Exhibit A at 6. The emissions defect warranty also provides similar protection, but adds the following language:

Ford warrants that your vehicle or engine:

- is designed, built, and equipped to conform, at the time it is sold, with the emissions regulations of the U.S. Environmental Protection Agency (EPA), and

- is free from defects in factory-supplied materials and workmanship which could cause it to fail to conform with applicable EPA regulations.

*Id.*, Exhibit A at 12.

Because the cost of the limited warranty is built into each new vehicle sales transaction between Ford and the dealer and between the dealer and the end consumer, *id.* at ¶ 2, the consumer does not pay any additional

---

1. Liberty also asserts the following ancillary causes of action: (a) violation of N.J.S.A. 56:10–7(e) and (f); (b) violation of the Dealer Day in Court Act, 15 U.S.C. §§ 1221–25; (c) breach of contract; (d) breach of implied covenant of good faith and fair dealing; (e) unjust enrichment; (f) conversion; (g) bad faith; (h) estoppel; and (i)

quantum meruit. Because these causes of action cannot survive without a finding that Ford violated N.J.S.A. 56:10–15, which it did not, and for the independent reasons set forth in Ford's opposition brief, *see Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment* at 13–25, these causes of action will be dismissed.

consideration for the limited warranty. Neither dealers (from Ford) nor consumers (from dealers) can purchase new vehicles without the limited warranty. *Id.* at ¶ 3.

In addition to the limited warranty, Ford offers several versions of ESPs, which provide additional repair cost protection during the lifetime of the ESP contract. *Id.* at ¶ 20; *Certification of Eric L. Chase*, Exhibit E. In this regard, Ford's 1996–Model Warranty Informational Booklet provides as follows:

> You can get additional protection for your new car or light truck by buying a Ford Extended Service Plan (Ford ESP). Ford ESP is an optional service contract, backed and administered by Ford. Ford ESP provides repair cost protection after the Bumper to Bumper Warranty expires and other benefits during the warranty, such as rental reimbursement and certain covered maintenance and wear items.
>
> You can buy Ford ESP from any participating Ford Motor Company dealer. Ford ESP is the only extended service program with the Ford name on it and the only service contract backed by Ford Motor Company.
>
> \* \* \* \* \* \*
>
> When you buy Ford ESP, you receive peace of mind protection throughout the United States and Canada by a network of more than 5,100 participating Ford Motor Company dealers.

*Id.*, Exhibit A at 25.

Ford sells ESPs to its participating dealers and the dealers, in turn, offer the ESPs for sale to owners of new and used Ford, Lincoln, and Mercury vehicles. *Id.* at ¶ 12. Ford's dealer prices range from just under $100 to over $2000, depending upon which ESP version is chosen. *Id.* at ¶ 13. Ford provides each dealer with manufacturer's suggested retail prices for the ESPs, which range from about $200 to over $3,500. *Id.* at ¶ 13. While dealers typically are not obligated to sell ESPs, approximately 80% choose to do so. *Id.* at ¶ 14. Dealers are also permitted to sell extended service contracts that compete with Ford's ESPs, and over 60% sell some form of competing service contract. *Id.* at ¶ 15. Additionally, although even Liberty concedes that ESPs typically represent optional and separate contracts offered at an additional cost, *Plaintiff's Brief in Support of Motion for Summary Judgment* at 6, it appears that at least one dealer occasionally absorbs the cost of ESPs at the time of the original new car transaction as an incentive to new car buyers. *See Certification of Genevieve K. LaRobardier*, Exhibit A; *see also* March 16, 1998 Letter from Defendant's Counsel.

When a dealer repairs a component covered by an ESP, it is reimbursed by Ford at a prescribed labor rate multiplied by the applicable Ford Service Time Standard for the repair involved. *Ayres Aff.* at ¶ 26. Dealers are also reimbursed for parts supplied in performing ESP-covered repairs according to formulae that provide for reimbursement at predetermined markups over dealer cost, depending upon the model year of the vehicle. *Id.; Robertazzi Cert.* at ¶ 11; *Certification of Kurt R. Olcheski* at ¶ 4. As discussed in *Liberty Lincoln–Mercury, Inc. v. Ford Motor Company*, 923 F.Supp. at 666–69, this framework was also used by Ford to determine reimbursement rates for repairs made pursuant to its limited warranty until this court found that the framework, and its accompanying surcharge scheme, violated N.J.S.A. 56:10–15. *Id.* at 668–69. The crux of this lawsuit is whether Ford's ESPs are subject to the same statutory requirements, a dispute that, given the difference in reimbursement rates, is more than merely academic.

## II.

In construing a New Jersey statute, the court's fundamental task is to effectuate the intent of the legislature in light of the language used and the objectives sought to be achieved. *Lesniak v. Budzash*, 133 N.J. 1, 8, 626 A.2d 1073 (1993) (citations omitted); *State v. Maguire*, 84 N.J. 508, 514, 423 A.2d 294 (1980). "[T]he first step is [to examine] the provisions of the [statute] to ascertain whether they are expressed in plain language that ... clearly and unambiguously yields only one interpretation." *Richard's Auto City, Inc. v. Director, Div. of Taxation*, 140 N.J. 523, 531, 659 A.2d 1360 (1995) (cita-

tions omitted); *see also Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842, (1990). If so, the unambiguous words used in the statute will carry their ordinary and well-understood meanings unless the statute "explicitly indicate[s]" that the words are to carry "special meanings." *State v. Mortimer*, 135 N.J. 517, 532, 641 A.2d 257 (1994), *cert. denied, Mortimer v. New Jersey*, 513 U.S. 970, 115 S.Ct. 440, 130 L.Ed.2d 351 (1994) (citations omitted); *State v. Afanador*, 134 N.J. 162, 171, 631 A.2d 946 (1993) (citations omitted). In any event, the court need not resort to materials outside the text of the statute unless the statute is unclear or ambiguous. *State v. Sutton*, 132 N.J. 471, 479, 625 A.2d 1132 (1993); *State v. Butler*, 89 N.J. 220, 226, 445 A.2d 399 (1982); *see also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

That having been said, the Act provides as follows:

> If any motor vehicle franchise shall require or permit motor vehicle franchisees to perform services or provide parts in satisfaction of a *warranty* issued by the motor vehicle franchisor: (a) The motor vehicle franchisor shall reimburse each motor vehicle franchisee for such services as are rendered and for such parts as are supplied, in an amount equal to the prevailing retail price charged by such motor vehicle franchisee . . . .

N.J.S.A. 56:10–15 (emphasis added).[2]

■ The Act neither defines "warranty" nor offers any basis upon which to give the term any special meaning. Thus, unless "warranty" is deemed unclear or ambiguous, its plain, well-understood, ordinary meaning will control. *Manalapan Realty, L.P. v. Township Committee of Tp. of Manalapan*, 140 N.J. 366, 383, 658 A.2d 1230 (1995) ("When construing legislation, in the absence of a specific definition, we give words their ordinary and well-understood meanings.") (quoting *Great Atlantic and Pacific Tea Co. v. Borough of Point Pleasant*, 137 N.J. 136,

143–44, 644 A.2d 598 (1994)); *see also Matter of Seidman*, 37 F.3d 911, 924 (3d Cir.1994).

In this regard, Webster's Collegiate Dictionary defines "warranty" as a "usually written guarantee of the integrity of a product and of the maker's responsibility for the repair or replacement of defective parts." *Webster's Collegiate Dictionary*, 1329 (9th ed.1985). Similarly, the American Heritage Dictionary defines "warranty" as "an assurance by the seller of property that the goods or property are as represented or will be as promised." *American Heritage Dictionary*, 1364 (2d College Ed.1985). Black's Law Dictionary defines "warranty," in the context of a commercial transaction, as follows:

> An assurance or guaranty, either express in the form of a statement by a seller of goods, or implied by law, having reference to and ensuring the character, quality, or fitness of purpose of the goods. A warranty is a statement or representation made by seller of goods, contemporaneously with and as part of contract of sale, though collateral to express object of sale, having reference to character, quality, fitness, or title of goods, and by which seller promises or undertakes to insure that certain facts are or shall be as he then represents them. (citations omitted). A promise or agreement by seller that article sold has certain qualities or that seller has good title thereto. A statement of fact respecting the quality or character of goods sold, made by the seller to induce the sale, and relied upon by the buyer.

*Black's Law Dictionary*, 1586 (6th ed.1990). According to these definitions, therefore, a warranty typically possesses the following characteristics: (a) a representation by the seller; (b) made at the time of the original transaction and as part of the basis of the bargain; (c) regarding the character, quality, or fitness of the goods sold; and (d) a promise or assurance by the seller to make the goods conform to that representation.

Ford argues that its ESPs are merely "service contracts," which do not possess the requisite characteristics of a "warranty." In

2. Unlike dealer reimbursement statutes that expressly make reference to warranties *and* service contracts, *see, e.g.,* N.Y. Veh. & Traf. Law § 465 (McKinney 1996); 63 Pa. Cons.Stat. Ann. § 818.9 (Supp.1997), the Automobile Warranty Reimbursement Act refers only to "warranties."

support of its argument, Ford relies upon the fifth edition of *Black's Law Dictionary*, which, according to Ford, defines a "service contract" as "a written agreement to perform maintenance on a consumer product for a specified duration." *Defendant's Brief in Support of Cross–Motion for Summary Judgment* at 8 (quoting *Black's Law Dictionary*, 1228 (5th ed.1979)). While the court was unable to locate *Black's* fifth edition, the sixth and current edition defines "service contract" as follows:

> A written agreement to perform maintenance or repair (or both) service on a consumer product for a specified duration. 15 U.S.C.A. § 2301. *See* Warranty (*Extended service warranty* ).

*Black's Law Dictionary*, 1369 (6th ed.1990). After proceeding to the definition of "warranty," as the definition of "service contract" directs, *Black's* reveals the following subdefinition of "extended service warranty":

> *Type of additional warranty* sold with purchase of ... motor vehicles ... to cover repair costs not otherwise covered by manufacturer's standard warranty. *Also known as an extended service contract,* such either extends the coverage period or extends the range of potential defects covered beyond the protection furnished in the contract for sale.

*Id.* at 1587 (emphasis added).

These definitions illustrate precisely why it is difficult to cull from the language of the Act a bright line distinction between terms such as "warranty," "extended warranty," "extended service warranty," "extended service contract," and "service contract." On one hand, a "service contract," which typically contains no representation as to the character, quality, or fitness of the goods sold and need not be part of the original sales transaction, would not appear to satisfy all of the criteria of a "warranty." Indeed, in many respects, an extended service contract is more akin to "repair insurance" than a "warranty." On the other hand, many sources (including Ford's employees and the same

law dictionary upon which Ford relies to demonstrate that ESPs are not warranties), rightly or wrongly, use the terms described above interchangeably. *See, e.g.,* Kenneth E. Spahn, *Service Warranty Associations: Regulating Service Contracts As "Insurance" Under Florida's Chapter 634,* 25 Stetson L.Rev. 597, 610–613 (Spring 1996) ("This general distinction [between insurance and warranty] becomes even more confusing ... as the terms 'service contract' and 'warranty' are often used interchangeably."); Barkley Clark & Christopher Smith, *The Law of Product Warranties,* ¶ 19.01 (1984) ("The terms 'service contract' and 'written warranty' are used interchangeably in some industries, causing confusion for consumers and business."); *Black's Law Dictionary,* 1369 (6th ed.1990); *see also Regency Oldsmobile, Inc. v. General Motors Corp.,* 1988 WL 36336, at \*1 (D.N.J. Apr.19, 1988). As a result, the court finds that the wording of N.J.S.A. 56:10–15, particularly as to the scope of the term "warranty," is, to say the least, not entirely clear. The court may, therefore, look to other sources of statutory construction.

One logical source is New Jersey's New Vehicle Lemon Law (the "New Vehicle Lemon Law"), N.J.S.A. 56:12–29 through 56:12–48, particularly given that, in 1991, the New Jersey Legislature partially incorporated it into the Automobile Warranty Reimbursement Act.[3] The purpose of the New Vehicle Lemon Law is to require manufacturers of new motor vehicles "to correct defects originally covered under the manufacturer's warranty which are identified and reported within a specified period." N.J.S.A. 56:12–29. Unlike the Automobile Warranty Reimbursement Act, the New Vehicle Lemon Law defines the terms "manufacturer's warranty" and "warranty" as "any warranty, whether express or implied[,] of the manufacturer[ ] of a new motor vehicle *of its condition and fitness for use,* including any terms or conditions precedent to the enforcement of obligations under the warranty." N.J.S.A. 56:12–30 (emphasis added).

---

**3.** In 1991, N.J.S.A. 56:10–15(c) was amended to require automobile manufacturers to reimburse dealers at their prevailing retail rates for the parts and services provided by dealers in making repairs on cars eventually returned to the manufacturers as "lemons" pursuant to the New Vehicle Lemon Law.

Contracts that merely promise to repair certain parts of an automobile and do not make any representations about the vehicle's "condition and fitness for use" would not appear to satisfy this definition. Although no reported case has expounded upon the meaning or scope of the term "warranty" in the context of the New Vehicle Lemon Law, a case in which the Supreme Court of Appeals of West Virginia interpreted a similar statute provides some guidance. *See Adams v. Nissan Motor Corp. in U.S.A.*, 182 W.Va. 234, 387 S.E.2d 288 (1989). At issue in *Adams* was the timeliness of a claim under that state's lemon law, which provides protection during the term of the warranty or one year, whichever is earlier. *Id.*, 387 S.E.2d at 292–93. The plaintiffs in that case argued that their extended service contract (referred to therein as a "Security Plus Agreement") extended the term of their warranty. *Id.* The court disagreed after evaluating the statute's definition of "warranty," a definition that is virtually identical to the definition under the New Jersey statute. *Id.* at 293. The court reasoned as follows:

> [W]e hold that the Security Plus Agreement is a service contract and not a warranty as intended by W. Va.Code § 46A–6A–5. West Virginia Code § 46A–6A–2(3) defines the 'manufacturer's express warranty' and 'warranty' to mean 'the written warranty of the manufacturer of a new motor vehicle of its condition and fitness for use, including any terms or conditions precedent to the enforcement of obligations under that warranty....' A brief perusal of the actual Security Plus Agreement document reveals that it fails to provide any warranty for fitness for use or the vehicle's condition. Instead, it merely provides for the repair of the vehicle without cost in the event of the mechanical breakdown of certain covered parts listed in the service agreement.

*Id.*

A similar result was reached in *Saladino v. Team Chevrolet, Inc.*, 242 Ill.App.3d 735, 183 Ill.Dec. 320, 611 N.E.2d 583 (1993), *appeal denied*, 152 Ill.2d 580, 190 Ill.Dec. 910, 622 N.E.2d 1227 (1993), which found that, in connection with the Magnuson–Moss Warranty Act, an agreement that "does not affirm the quality or workmanship of the automobile [or] ... warrant against defects" and merely "offer[s] to repair certain defects that may occur within a certain time period or number of miles," is not a warranty. *Id.*, 611 N.E.2d at 588.

Another source to be considered is New Jersey's version of the Uniform Commercial Code (the "Code"). The Code's definition of express warranties by affirmation, promise, description, and sample provide, in relevant part, as follows:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J.S.A. 12A:2–313(1)(a)–(c). Thus, similar to the New Vehicle Lemon Law's definition, the Code's definition of the term "warranty" includes the fundamental requirement that the seller make a representation or affirmation regarding the product to be sold.

The foregoing authorities, in this court's opinion, support a finding that the New Jersey Legislature did not intend the definition of "warranty" to encompass any extended contract that does not, among other things, contain such a representation. As also discussed above, however, it is equally clear to this court that terms such as "service contract" and "extended service contract" are often used interchangeably and confused with the terms "warranty" and "extended warranty." Unless there is some evidence that the New Jersey Legislature confused these terms or intended that they be used interchangeably, however, this fact alone,

given the authorities cited above, cannot carry the day. Although sparse, the evidence that does exist regarding this issue suggests the contrary.

While New Jersey's Used Vehicle Lemon Law, N.J.S.A. 56:8–67 through 8–80, has little other relevance to this matter, particularly given that, by its terms, it does not apply to *new* vehicles or *new* vehicle warranties, it illustrates that the New Jersey Legislature, at least as of 1995, was aware that "warranties" and "service contracts" are separate and distinct concepts. Enacted in 1995, the Used Vehicle Lemon Law, among other things, prohibits numerous unlawful practices, including the failure to disclose the existence of any "written warranty, service contract or repair insurance currently in effect on a used motor vehicle," N.J.S.A. 56:8–68(d), and requires dealers to provide at the time of sale a free written warranty, the duration of which depends upon the vehicle mileage. N.J.S.A. 56:8–69. Unlike the Automobile Warranty Reimbursement Act or the New Vehicle Lemon Law, the Used Vehicle Lemon Law defines both of the terms at issue in this matter:

> "Warranty" means any undertaking, in writing and *in connection with the sale by a dealer* of a used motor vehicle, to refund, repair, replace, maintain or take other action with respect to the used motor vehicle,

and which is provided *at no extra charge* beyond the price of the used motor vehicle. "Service Contract" means a contract in writing to refund, repair, replace, maintain or take other action with respect to a used motor vehicle for any period of time or any specific mileage or provided *at an extra charge* beyond the price of the used motor vehicle.

N.J.S.A. 56:8–67 (emphasis added). For purposes of this case, the definitions themselves are not relevant, and are arguably misleading.[4] What is relevant, however, is that the New Jersey Legislature recognizes that the two concepts exist and are different from one another.

 Accordingly, the court is not aware of, nor has it been presented with, any reason to find that the New Jersey Legislature intended the term "warranty" to encompass any agreement, irrespective of the label[5] used, that does not possess the following characteristics: (a) a representation by the seller; (b) made at the time of the original transaction and as part of the basis of the bargain; (c) regarding the character, quality, or fitness of the goods sold; and (d) a promise or assurance by the seller to make the goods conform to that representation. Because ESPs do not make any representations regarding the quality, condition, or fitness of the vehicles sold,[6] they do not satisfy this definition.[7]

---

4. For instance, the lack of any "representation of quality, condition, and fitness" requirement does not mean that such a requirement ceases to exist for purposes of this case (or that it somehow supersedes or overrules the New Vehicle Lemon Law definition). The definitions contained in the Used Vehicle Lemon Law clearly apply *only* to used vehicles; indeed, that Act distinguishes used vehicle warranties from original manufacturer's warranties, which are referred to but not defined. Although the legislative history is silent on this issue, there is at least one plausible reason for this distinction—it would be difficult, if not impossible, for a used car dealer to offer a "warranty" in the traditional sense because the dealer typically is not, and often has no relationship with, the manufacturer and, as a result, has no idea about the true quality, condition, or fitness of the used vehicle or how the vehicle has been treated—or mistreated—by its previous owner or owners. *See* N.J.S.A. 56:8–68(c). Thus, any argument (which, incidently, has not been made in this matter) that Ford's ESPs satisfy the Used Vehicle Lemon Law definition and,

therefore, should be considered a warranty for the purposes of N.J.S.A. 56:10–15 must fail.

5. The linchpin of the court's analysis is the *structure* of the ESP contracts themselves, not the name or label to which they are referred. Thus, any internal literature or deposition testimony in which Ford or its employees referred to ESPs as "extended warranties" or the like, while arguably relevant to a deceptive trade practice or fraud claim, is irrelevant for purposes of this motion.

6. Liberty argues that ESPs contain such representations because dealers are required to use Ford parts and, pursuant to Ford's marketing strategy, consumers are told that, by purchasing an ESP, they will receive "peace of mind." Neither of these facts, in this court's opinion, rises to the level of a representation regarding the quality, condition, or fitness of the vehicles sold.

Likely anticipating such a ruling, Liberty relies upon the Magnuson–Moss Warranty Act in support of its alternative contention that ESPs need

Finally, albeit parenthetically, as a matter of at least this court's common sense, "warranties" and "service contracts," including Ford's ESPs, embody two quite different concepts. Whenever one purchases a new car, the manufacturer's "warranty," either implicitly or explicitly, represents to him or her that nothing will go wrong with the car during the warranty period, but if it does, the car will be fixed. Such a representation is given to all consumers at the time of every purchase. A service contract, on the other hand, is optional on the part of the consumer and can be obtained, often for a separate fee and always pursuant to a separate contract, long after the consumer purchases the car. More importantly, it does not guarantee the integrity of the car; rather, it recognizes, either implicitly or explicitly, that the car can (or will) start to break down beyond the warranty period and, if (or when) it does, it will be fixed.

If the court's "common sense" makes any sense at all, it further supports its legal conclusion that although ESPs complement and, in some respects, are similar to Ford's limited warranty, under no exercise of statutory construction can they be deemed to fall within the purview of the statute. Had the New Jersey Legislature intended to regulate extended service contracts such as ESPs, it could and, presumably, would have done so. It is not within the province of this court, however, to do judicially what New Jersey's elected officials have not done legislatively. As an esteemed member of the Court of Appeals for the Third Circuit has recently observed, "I do not make the laws. I just work here."

### III.

For the reasons discussed above, plaintiff's motion for summary judgment will be denied and defendant's cross-motion for summary

---

not make any representations regarding the quality, condition, or fitness of the vehicles sold in order to satisfy the definition of "warranty" under N.J.S.A 56:10–15. The Magnuson–Moss Warranty Act provides two alternative definitions of the term "warranty." Under the first definition (the "traditional definition"), "written warranty" is defined as:

> any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time.

15 U.S.C. § 2301(6)(A). Under the second definition (the "alternative definition"), "written warranty" is defined as:

> any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking.

15 U.S.C. § 2301(6)(B). In addition to the foregoing, under either definition, the "affirmation, promise, or undertaking [must be] part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product." 15 U.S.C. § 2301(6).

Given that neither the Automobile Warranty Reimbursement Act, the New Vehicle Lemon Law, nor the New Jersey version of the Uniform Commercial Code makes any reference to the federal Act or such alternative definitions, the court does not see how that Act can legitimately apply and, therefore, will not apply the federal

definitions in this matter. Even if it did, however, Ford's ESPs would not only fail to satisfy the traditional definition for the reasons discussed above, but would also not appear to satisfy the alternative definition because there are no "specifications set forth in the [ESP] undertaking." In the absence of such specifications, ESPs would merely be considered "service contracts" under 15 U.S.C. § 2301(8).

7. Ford also argues that ESPs do not satisfy these criteria because, unlike the limited warranty, they are not part of the basis of the bargain. As discussed above, each vehicle that Ford manufactures and sells to authorized dealers for resale to consumers includes a new vehicle limited warranty. The limited warranty cannot be purchased separately, nor can a consumer acquire a new vehicle from a Ford dealer without such a warranty. Thus, in all respects, the limited warranty is part of the basis of the bargain when the vehicle is sold. Ford contends that ESPs, on the other hand, are created by a *separate* contract and typically for a *additional fee* and, as result, are not part of the basis of the bargain in the traditional (and required) sense. While Ford's argument has considerable force, *see, e.g.*, N.J.S.A. 56:8–67 (definition of "warranty" requiring that it be at "no extra charge"); Barkley Clark & Christopher Smith, *The Law of Product Warranties, supra*, at ¶ 19.02[1] ("If the consumer must give any consideration beyond the purchase price of the product in order to benefit from the agreement, it will be a service contract rather than a written warranty.") (citing 16 C.F.R. § 700.11(b) & (c)); the court, given the disposition herein, need not decide this issue.

judgment will be granted. As a result, plaintiff's complaint will be dismissed.

### ORDER

This matter having come before the court upon the motion of plaintiff Liberty Lincoln–Mercury, Inc. for summary judgment pursuant to Fed.R.Civ.P. 56(a) and the cross-motion of defendant Ford Motor Company for summary judgment pursuant to Fed.R.Civ.P. 56(b); and the court having reviewed the submissions of the parties without oral argument pursuant to Fed.R.Civ.P. 78; and for the reasons discussed in the opinion of even date;

IT IS ON THIS 27th day of May, 1998;

ORDERED that plaintiff's motion for summary judgment be and hereby is denied and defendant's cross-motion for summary judgment be and hereby is granted; and it is further

ORDERED that plaintiff's complaint be and hereby is dismissed.