

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-1999

# Liberty Lincoln v. Ford Mtr Co

Precedential or Non-Precedential:

Docket 98-6135

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Liberty Lincoln v. Ford Mtr Co" (1999). *1999 Decisions.* Paper 65.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/65

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 17, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6135

LIBERTY LINCOLN-MERCURY, INC.

      Appellant

v.

FORD MOTOR COMPANY

On Appeal from the United States District Court
for the District of New Jersey
(Civil Action No. 96-6037 (MTB))
District Judge: Hon. Maryanne Trump Barry

Argued January 11, 1999

BEFORE: GREENBERG and SCIRICA, Circuit Judges,
and CARMAN,* Chief Judge,
U.S. Court of International Trade

(Filed: March 17, 1999)

       ERIC L. CHASE, ESQ. (ARGUED)
       Bressler, Amery & Ross, P.C.
       P.O. Box 1980
       Morristown, New Jersey 07962

        Attorney for Appellant

_____

*Honorable Gregory W. Carman, Chief Judge of the United States Court
of International Trade, sitting by designation.

DENNIS R. LAFIURA, ESQ. (ARGUED)
Pitney, Hardin, Kipp & Szuch
P.O. Box 1945
Morristown, New Jersey 07962-1945

   Attorney for Appellee

OPINION OF THE COURT

CARMAN, Chief Judge:

I. INTRODUCTION

This is an appeal of the district court's order directing summary judgment for appellee, Ford Motor Company (Ford), and denying summary judgment for appellant, Liberty Lincoln-Mercury, Inc. (Liberty). Appellant challenges the district court's determination that, as a matter of law, Ford's Extended Service Plans (ESPs) are not included under the New Jersey Franchise Practices Act (FPA). N.J. STAT. ANN. SS 56:10-1 to 10-15 (West 1999). Appellant also challenges the district court's dismissal of its additional common law and statutory claims. Additionally, appellant argues it is entitled to summary judgment against Ford because of Ford's refusal to pay the retail reimbursement rate under the FPA.

The FPA obligates the franchisor to "reimburse each motor vehicle franchisee for such services as are rendered and for such parts as are supplied, in an amount equal to the prevailing retail price charged by such motor vehicle franchisee for such services and parts" in satisfaction of a warranty. S 56:10-15(a). Ford requires its dealers to repair and replace parts under both Ford's standard written warranties and Ford's ESPs, however, the reimbursement rate differs under each contract type. Ford reimburses dealers for standard written warranty repairs at the "retail rate" for the parts and work done. In 1991, Ford recognized Liberty's retail rate to be seventy seven percent over dealer cost. When a dealer performs ESP-covered repairs, however, it is reimbursed for labor at a prescribed labor rate multiplied by the applicable Ford Service Time Standard for

2

the repair involved. Dealers are reimbursed for parts supplied in performing ESP repairs according to formulae that provide for reimbursement at only thirty to forty percent markups over dealer cost depending upon the model year of the vehicle.

The district court permitted the distinction in reimbursement rates between Ford's ESPs and standard written warranties because it characterized the Ford ESPs as service contracts and determined that there was a distinction under New Jersey law between service contracts and warranties. The district court concluded that"under no exercise of statutory construction can [Ford's ESPs] . . . fall within the purview of the [FPA]." Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 8 F. Supp. 2d 450, 457 (D.N.J. 1998) (Liberty III).

We reject the district court's characterization of Ford's ESPs. This Court concludes an ESP contract may include warranty provisions that fall under the FPA because at least some of the ESPs cover defects in factory–supplied parts or workmanship, as do the standard warranties. Based on this conclusion, we must determine whether there is sufficient evidence to create a genuine issue of material fact, a decision that turns, in part, on whether provisions of Ford's ESPs formed part of the basis of the bargain for sales of Ford vehicles. Because we find that provisions of Ford's ESPs may or may not have formed part of the basis of the bargain for sales of vehicles by appellant, we conclude there is a genuine issue of material fact, and summary judgment is inappropriate. Accordingly, the judgment of the district court is vacated, and the case is remanded for trial.

II. FACTUAL BACKGROUND

The facts of this case have been set forth in great detail in Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 923 F. Supp. 665 (D.N.J. 1996) (Liberty I), aff 'd in part, rev'd in part, rev'd and vacated in part on other grounds, 134 F.3d 557 (3rd Cir. 1998) (Liberty II).1  The pertinent facts to this appeal are set forth below.

_____

1. In Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 134 F.3d 557 (3rd Cir. 1998), this Court applied the Franchise Practices Act (FPA), N.J. STAT. ANN. S 56:10–1 to 10–15 (West 1999), to Ford's reimbursement of its licenced franchised dealers who made repairs pursuant to warranties issued by Ford.

A. Standard Warranties

Ford manufactures automobiles, including Lincoln and Mercury vehicles, and sells them through franchised dealers. Liberty is one such dealer. Ford's relationship with Liberty is governed by a Lincoln Sales and Service Agreement and a Mercury Sales and Service Agreement. Every vehicle Ford sells to its dealers for resale comes with a standard written Ford New Vehicle Limited Warranty (Standard Warranty). The Standard Warranty contains a bumper to bumper warranty that requires dealers to repair, replace or adjust all parts, except tires, of the vehicle sold that are defective with regard to factory-supplied materials or workmanship up to a specified period of years or mileage, whichever comes first. The Standard Warranty also covers safety belts and supplemental restraint systems. Body sheet metal panels are covered against corrosion for a limited period of time or miles, whichever comesfirst. The Standard Warranty's cost is built into the price of each new vehicle sold by Ford to the dealer and by the dealer to the end consumer. Purchasers of Ford vehicles do not pay any additional consideration for the Standard Warranty nor can they purchase new vehicles without the Standard Warranty.

B. Extended Service Plans

In addition to its Standard Warranty, Ford also offers a variety of ESPs which "protect owners against the repair/replacement costs of specific major components after warranty." For example, Ford's Base ESP "adds to [the] vehicle's standard 6/60 powertrain warranty, covering many more parts and repairs." The Base ESP "[c]overs 82 major components against defects in factory-supplied materials or workmanship." Other ESPs also provide additional services such as coverage for scheduled maintenance services on covered components and replacement of certain items due to wear and tear.

Ford sells ESPs to its participating dealers who, in turn, offer the ESPs for sale to owners of used and new Lincoln and Mercury automobiles. An ESP is purchased in a separate, optional contract, usually for additional consideration.2 An ESP may be transferred by the
_____

2. There is at least one example in the record where as part of a promotion a Ford Extended Service Plan (ESP) contract appears to have been available without additional consideration.

4

purchaser to a subsequent purchaser of the vehicle only by paying a fee to Ford. Dealers do not have to sell Ford ESPs and may sell ESPs offered by other providers, including themselves. Some eighty percent of Ford dealers sell Ford ESPs, and around sixty percent of Ford dealers sell competing ESPs. An ESP purchaser may cancel a Ford ESP, and he will receive a refund of a portion of the ESP's purchase price. Finally, an ESP is not available for purchase after the Standard Warranty expires.

Ford dealers must perform all Standard Warranty and ESP work on all Ford cars sold by a dealer. Dealers risk franchise termination if they refuse service. As with Standard Warranties, dealers must purchase all parts used for ESP repairs from Ford at prices set by Ford, and the dealer must absorb the attendant business costs, such as storage and inventory control, for those parts. Dealers seeking reimbursement from Ford for ESP repairs must use the same forms and processes for the submission of their claims as they use for their Standard Warranty claims.

III. STANDARD OF REVIEW

This Court's review of a district court's grant of summary judgment is plenary. See Matthews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3rd Cir. 1996). Circuit courts "owe no deference to district court adjudications of state law," Leavitt v. Jane L., 518 U.S. 137, 145 (1996), even though the district court may have "local expertise." Salve Regina College v. Russell, 499 U.S. 225, 235-40 (1991). This Court must determine whether the record, when viewed in the light most favorable to appellant, Liberty, shows that there are no genuine issues of material fact and that appellee, Ford, was entitled to judgment as a matter of law. See Salley v. Circuit City Stores, Inc., 160 F.3d 977, 980 (3rd Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

IV. THE FRANCHISE PRACTICES ACT

The FPA requires franchisors to "reimburse each motor vehicle franchisee for such services as are rendered and for such parts as are supplied, in an amount equal to the

5

prevailing retail price charged by such motor vehicle franchisee for such services and parts." S 56:10-15(a). Reimbursement is required "[i]f any motor vehicle franchise shall require or permit motor vehicle franchisees to perform services or provide parts in satisfaction of a warranty issued by the motor vehicle franchisor." Id. In order to make a prima facie case under the FPA, a plaintiff must show that the services or parts for which it is seeking reimbursement at the retail rate were performed or replaced pursuant to an agreement that is a "warranty" under the FPA.

The FPA does not define the term "warranty." In the absence of a specific statutory definition, the language of the statute should be given its "ordinary meaning and construed in a common sense manner to accomplish the legislative purpose." N.E.R.I. Corp. v. New Jersey Highway Auth., 686 A.2d 328, 335 (N.J. 1996) (quoting State v. Pescatore, 516 A.2d 261, 264 (N.J. Super. Ct. App. Div. 1996)); see also Manalapan Realty, L.P. v. Township Comm. of the Township of Manalapan, 658 A.2d 1230, 1239 (N.J. 1995) (citations omitted).

The district court found, and this Court agrees, that the ordinary definition of "warranty" is unhelpful in resolving the issue before the Court. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2578 (1981) defines "warranty" as:

> [a] usu. written guarantee of the integrity of a product and the good faith of the maker given to the purchaser and generally specifying that the maker will for a period of time be responsible for the repair or replacement of defective parts and will sometimes also provide periodic servicing.

BLACK'S LAW D ICTIONARY 1586 (6th Ed. 1990) defines "warranty" as:

> [a]n assurance or guaranty, either express in the form of a statement by a seller of goods, or implied by law, having reference to and ensuring the character, quality, or fitness of purpose of the goods. A warranty is a statement or representation made by seller of goods, contemporaneously with and as a part of contract of sale, though collateral to express object of

6

sale, having reference to character, quality, fitness, or title of goods, and by which seller promises or undertakes to insure that certain facts are or shall be as he then represents them.

Therefore, contracts that only promise to repair certain parts of a vehicle and do not make any representations about the vehicle's "integrity," "character," "quality" or "fitness" would not appear to satisfy either of the above definitions.

A "service contract," however, which is included as a subspecies of warranty under BLACK'S "extended service warranty" definition, is defined in BLACK'S as "[a] written agreement to perform maintenance or repair (or both) service on a consumer product for a specified duration. 15 U.S.C.A. S 2301, See Warranty (Extended service warranty).3 " Id. at 1369. Unlike warranties, service contracts do not need to have a representation about a good's quality, fitness or integrity and need not be part of the original contract of sale. Nevertheless, they are included as a subspecies of warranty under BLACK'S definition. Thus, it appears there is no bright line definition of the term "warranty."4 Since the term "warranty" in the FPA is not clear and the ordinary meaning is unhelpful, the Court should read the statute as a whole and read the FPA in "full light of its history, purpose and context." Koch v. Director, Division of Taxation, 1999 WL 14127, *3 (N.J. 1999) (citations omitted).

_____

3. BLACK'S LAW DICTIONARY 1587 (6th Ed. 1990) defines "extended service warranty" as a:

[t]ype of additional warranty sold with purchase of appliances, motor
vehicles, and other consumer goods to cover repair costs not otherwise covered by manufacturer's standard warranty. Also known as an extended services contract, such either extends the coverage period or extends the range of potential defects covered beyond the protection furnished in the contract of sale.

4. The district court discussed at length the widespread confusion over the two terms and how "extended warranty" and"service contract" are often used interchangeably. See Liberty Lincoln–Mercury, Inc. v. Ford Motor Co., 8 F. Supp. 2d. 450, 454 (D. N.J. 1998).

The legislative history of the FPA, however, offers little or no assistance in defining the term "warranty" under the FPA. See Legislative Statement, L.1977, c.84, S 3, Assembly No. 1956 (N.J. May 24, 1976). The legislative history speaks only to the purpose of the statute. The purpose is twofold: first, to "safeguard consumers;" and second, to "offer[ ] protection to the competent retailer against arbitrary actions by manufacturers." Id. This Court has held that the FPA is a "remedial statute intended to equalize the disparity of bargaining power in franchisor-franchisee relations." Liberty II, 134 F.3d at 566. Thus, the only legislative intent that can be discerned from the FPA's history is that the definition of "warranty" must be construed in a way that protects the "competent retailer" from "arbitrary actions by manufacturers."

When the ordinary meaning of a statute and the statute's legislative history fail to provide sufficient guidance to a term's meaning, sound principles of statutory construction instruct the Court to look to other statutes pertaining to the same subject matter which contain similar terms.5 See 2B NORMAN J. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION SS 51.01, 51.02, 51.03 (5th Ed. 1992). A prior statute's definition of the term will control if it is natural and reasonable to think that the members of the legislature, in drafting the new statute, were influenced by the prior statute. See id.; see also, e.g., In the Matter of Return of Weapons to J.W.D., 693 A.2d 92, 115–17 (N.J. 1997); State v. Brown, 126 A.2d 161, 166 (N.J. 1956).

_____

5. The parties direct the Court's attention to four statutes, only one of which, the Uniform Commerce Code (UCC), the Courtfinds helpful. The first three statutes are the New Jersey New Vehicle Lemon Law (NVLL), N.J. STAT. ANN. SS 56:12–29 to 12–49 (West 1999), the New Jersey Used Vehicle Lemon Law (UVLL), N.J. STAT. A NN. SS 56:8–67, 56:8–67.1 (West 1999), and the Magnuson–Moss Warranty Act (MMWA), 15 U.S.C.A. SS 2301–2312 (West 1999). The UVLL is unhelpful because it does not apply to new vehicles or new vehicle warranties. The NVLL is unhelpful because it uses the term "warranty" to define itself. See S 56:12–30. The MMWA is unhelpful because it is a federal statute and therefore does not speak to the intent of the New Jersey legislature with regard to the use of the term "warranty." The fourth statute is New Jersey's incorporation of the UCC and is addressed in the text.

The Uniform Commercial Code (UCC) is the law that governs commercial transactions in New Jersey and was incorporated into law in New Jersey before the FPA was enacted. See N.J. STAT. ANN . S 12A:1-102(2)(b) (West 1999). The UCC provides "unified coverage of its subject matter" and avoids repeals by implication. S 12A:1-104. The Court will use the UCC's definition of "warranty," see S 12A:2-313(1), to discern the meaning of "warranty" under the FPA. The Court uses this definition for two reasons.6 First, Article Two of the UCC applies to transactions in goods, see S 12A:2-102, and the "warranty" contemplated in section 10-15 of the FPA is related to a sale of a good, a motor vehicle. Second, there is nothing in the FPA that explicitly repeals the UCC as to automobile warranties.

We find the UCC's definition of warranty compelling and look to its elements to determine the definition of warranty under the FPA. Unlike the district court, however, we find that an ESP contract may include warranty provisions that fall under the FPA, notwithstanding the fact that the same ESP contract may also include service provisions. See, e.g., Newmark v. Gimbel's Inc., 258 A.2d 697, 701 (N.J. 1969) (finding that a warranty exists "with no less force" in a "hybrid" sale and service contract "than it would have in the case of a simple sale"). We now turn to the elements of a warranty under the UCC.

The New Jersey UCC defines "express warranties" as:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of

_____

6. The UCC definition of warranty is also instructive because the rules of statutory interpretation suggest that statutes with similar purposes be construed with reference to each other. See State v. DiCarlo, 338 A.2d 809, 811 (N.J. 1975). Both the UCC and the FPA strive to protect consumers in their purchases. S 12A:2-312, Official Comment 4; Legislative Statement, L.1977, c.84, S 3, Assembly No. 1956 (N.J. May 24, 1976).

the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

S 12A:2-313(1).

The UCC makes it clear that an express warranty is created when a promise is made by a seller to a buyer which relates to a good and becomes part of the basis of the bargain. See S 12A:2-313(1). The seller promises that the good sold will conform to some standard which may be established by a model, a level of quality, an assurance, a description or a list of specifications. The UCC does not require the use of formal words of promise or that the seller have a specific intention to warrant the good but rather that the substance of the sales agreement contains a promise of conformity as described above. See S 12A:2-313(2).

The policy behind a warranty should also be taken into consideration when determining whether a warranty exists. Generally, the seller knows more about the good and is better able to absorb any loss resulting from a dangerous condition relating to the good than the buyer. See Cintrone v. Hertz Truck Leasing & Rental Servs., 212 A.2d 769, 775 (N.J. 1965) ("Warranties of fitness are regarded by law as an incident of transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred and to distribute the losses that may occur because of a dangerous condition the chattel possess."). It must be emphasized, however, that not all promises of conformity to some standard are warranties; to be a warranty, the promise must also be part of the basis of the bargain for the purchase of the good.

What constitutes "part of the basis of the bargain" is hard to define. See 3 MARY ANNE FORAN, WILLISTON ON SALES S 17-7 (5th Ed. 1994). The UCC does not define what constitutes "part" or "basis." This Court has held that a promise is presumed to be a "part of the basis of the

10

bargain" under New Jersey law "once the buyer has become aware of the affirmation of fact or promise . . . ." Cipollone v. Liggett Group, Inc., 893 F.2d. 541, 568 (3rd Cir. 1990), overruled on other grounds, 505 U.S. 504 (1992). The defendant may rebut this presumption by " `clear affirmative proof ' . . . that the buyer knew that the affirmation of fact or promise was untrue."[7] Id.

WILLISTON ON SALES notes that "bargain" does not refer to a specific fixed point in time but rather to the relationship between the parties to a commercial transaction. See WILLISTON ON SALES atS 17-7; see also, e.g., Autzen v. John C. Taylor Lumber Sales, Inc., 572 P.2d 1322, 1325 (Or. 1977) (The bargain relevant to the creation of a warranty under the UCC does not occur at any fixed point in time but "describes the commercial relationship between the parties as to the product."). Indeed, Official Comment Seven to section 2-313 of the UCC states that:

> The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract. If language is used after the closing of the deal . . . the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order (emphasis added).

S 12A:2-313, Official Comment 7. Thus, the focus is not on any particular language at a particular point in time but whether the seller's actions or language when viewed in light of his relationship with the buyer were fairly regarded as part of the contract to purchase the good.

Appellant, Liberty, argues that Ford's ESPs are always part of the basis of the bargain in the sale of Ford vehicles by Ford dealers and must be viewed either as part of the

_____

7. This Court recognizes that reliance may become a factor in determining whether or not an affirmation of fact or promise is part of the basis of the bargain. If the defendant has proven non-belief, the plaintiff may still recover economic damages if he can prove reliance despite non-belief. See Cipollone v. Liggett Group, Inc., 893 F.2d. 541, 568 n.31 (3rd Cir. 1990), overruled on other grounds, 505 U.S. 504 (1992).

original contract or as a post-sale modification of the sales contract. Additionally, Liberty argues that Ford ESPs purchased after the original sale of the vehicle are valid post-sale modifications of the original sale and part of the basis of the bargain of the original sale because the initial transaction contained the opportunity to obtain a Ford ESP and that opportunity remains open as part of the transaction until the termination of the Standard Warranty. Liberty bases its assertions on Ford's promotional literature, the fact that ESPs are available only to purchasers of new Ford vehicles and the fact that Ford ESPs are specific to the particular vehicle sold.

Appellee, Ford, argues that its ESPs are not part of the basis of the bargain in the sales of its vehicles since they are contracts separate from the sales agreements and require additional consideration. Given the definition of "warranty" discussed above, this Court finds that there is a genuine issue of material fact as to whether provisions in at least some Ford ESPs form a part of the basis of the bargain in the sale of a vehicle by appellant Liberty. As a result, this Court concludes that this case must be remanded for trial.

V. CONCLUSION

For the foregoing reasons, we vacate the district court's order of summary judgment and remand this case for a determination consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

12