**FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE FIRST CIRCUIT

_____

**BAP NOS. NH 18-056, NH 18-063**
_____

**Bankruptcy Case No. 18-10552-BAH**
_____

**DARLENE MARIE VERTULLO,**
**a/k/a Darlene M. Marie Underwood,**
**Debtor.**

_____

**U.S. BANK NATIONAL ASSOCIATION, as Trustee**
**for Credit Suisse First Boston Mortgage Securities Corp.,**
**CSFB Mortgage-Backed Pass-Through Certificates, Series 2005-8,**
**Appellant,**

**v.**

**DARLENE MARIE VERTULLO,**
**Appellee.**

_____

**Appeals from the United States Bankruptcy Court**
**for the District of New Hampshire**
**(Hon. Bruce A. Harwood, U.S. Bankruptcy Judge)**

_____

**Before**
**Bailey, Hoffman, and Finkle,**
**United States Bankruptcy Appellate Panel Judges.**

_____

**David M. Bizar, Esq., and J. Patrick Kennedy, Esq., on brief for Appellant.**
**Leonard G. Deming, II, Esq., on brief for Appellee.**

_____

**January 10, 2020**
_____

**Hoffman, U.S. Bankruptcy Appellate Panel Judge.**

U.S. Bank National Association, as Trustee for Credit Suisse First Boston Mortgage Securities Corp., CSFB Mortgage-Backed Pass-Through Certificates, Series 2005-8 ("U.S. Bank" or the "Bank"), appeals from two bankruptcy court orders: (1) the order denying its motion for relief from the automatic stay (the "Order Denying Stay Relief"); and (2) the order confirming the amended chapter 13 plan filed by the debtor, Darlene Marie Vertullo (the "Debtor"), as modified in open court (the "Confirmation Order").[1] For the reasons set forth below, we **REVERSE** both orders and **REMAND** to the bankruptcy court for further proceedings.

## BACKGROUND

**I.    The Bankruptcy Filings**

U.S. Bank was the holder of a mortgage, originally given by the Debtor and James E. Underwood to SLM Financial Corp., on certain real property located in Nashua, New Hampshire (the "Property"). Following the Debtor's default in her payment obligations under the note secured by that mortgage, U.S. Bank conducted a foreclosure by public auction on January 11, 2017, at which a third party purchased the Property. No foreclosure deed from the Bank to the third party purchaser was ever recorded in the local land records registry.

On May 9, 2017, about four months after the foreclosure auction, the Debtor filed a petition under chapter 13 of the Bankruptcy Code in the New Hampshire bankruptcy court.[2]

---

[1] The Bank separately appealed the orders and filed a motion to consolidate the appeals. We denied that motion but companioned the appeals for briefing and oral argument and now for disposition.

[2] All references to "Bankruptcy Code" or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq.

The bankruptcy court dismissed that case on March 29, 2018, due to the Debtor's failure to make plan payments. The Debtor filed the chapter 13 case from which these appeals arise, pro se, on April 26, 2018 (the "Current Chapter 13 Case").

## II.     The Motion for Relief from Stay and the Debtor's Objection

On May 22, 2018, U.S. Bank filed a motion for relief from the automatic stay pursuant to Bankruptcy Code § 362(d)(1) (the "Motion for Stay Relief").[3] Alleging that the Debtor continued to occupy the Property "without any claim of right or ownership," U.S. Bank requested authorization "to continue its state court rights" in order to gain possession of the Property. The Debtor filed an objection to the Motion for Stay Relief, asserting that the foreclosure sale was void because no foreclosure deed had been recorded before the filing of the Current Chapter 13 Case. In support, she quoted the following language from N.H. Rev. Stat. Ann. § 479:26 regarding foreclosure sales:

> Failure to record said deed and affidavit within 60 days after the sale shall render the sale void and of no effect only as to liens or other encumbrances of record with the register of deeds said county [sic] intervening between the day of the sale and the time of recording of said deed and affidavit.

The Debtor urged the bankruptcy court to follow In re Beeman, 235 B.R. 519 (Bankr. D.N.H. 1999), in which the court ruled that a foreclosure sale is completed upon recording of a deed, and until that time a debtor mortgagor retained rights in the property. She asked the bankruptcy court to eschew this court's holding in TD Bank, N.A. v. LaPointe (In re LaPointe), 505 B.R. 589, 595 (B.A.P. 1st Cir. 2014), that a chapter 13 debtor mortgagor no longer had any rights in the

---

[3] The bankruptcy court had previously granted the Debtor's motion under Bankruptcy Code § 362(c)(3)(B) to extend the automatic stay, which would have expired thirty days after the Debtor's second bankruptcy petition.

mortgaged property once the auctioneer's hammer fell irrespective of when or if a foreclosure deed was recorded.

**III.    The Amended Chapter 13 Plan and U.S. Bank's Objection to Confirmation**

In her amended chapter 13 plan (the "Plan") filed in May 2018, the Debtor proposed to retain the Property, cure pre-petition defaults in the mortgage to U.S. Bank through the Plan, and make regular post-petition payments directly to U.S. Bank.  The Bank filed an objection to confirmation of the Plan (the "Objection to Confirmation"), arguing that the Property was no longer part of the bankruptcy estate as it had been sold to a third party at a foreclosure auction. The Debtor countered by reiterating that U.S. Bank had failed to comply with N.H. Rev. Stat. Ann. § 479:26 by filing a foreclosure deed even though 470 days had passed since the auction. She asked the court to overrule the Objection to Confirmation.

**IV.    The Orders**

On October 1, 2018, the bankruptcy court entered the Order Denying Stay Relief and a separate order overruling the Bank's Objection to Confirmation.  In its accompanying memorandum, the court observed that the Motion for Stay Relief and the Objection to Confirmation raised the same legal issue: "whether the Debtor has a sufficient property interest in [the Property] that she may cure defaults under a mortgage that encumbers the Property and which U.S. Bank holds." In re Vertullo, 593 B.R. 92, 94 (Bankr. D.N.H. 2018).  The court answered that question in the affirmative, stating: "[T]he Court finds that the Debtor does have a sufficient interest in the Property and so will deny the Motion for [Stay] Relief and schedule a continued confirmation hearing on the Chapter 13 Plan." Id.

On December 4, 2018, the bankruptcy court entered the Confirmation Order, thereby confirming the Plan as orally modified in open court.[4]

U.S. Bank timely appealed both the Order Denying Stay Relief and the Confirmation Order. As in the proceedings below, the issue is binary. U.S. Bank insists that LaPointe is correct, while the Debtor urges us to overturn LaPointe and follow Beeman.

## JURISDICTION

"Pursuant to 28 U.S.C. §§ 158(a) and (b), the Panel may hear appeals from 'final judgments, orders, and decrees,' § 158(a)(1), or 'with leave of the court, from interlocutory orders and decrees.' § 158(a)(3)." Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643, 645 (B.A.P. 1st Cir. 1998); see also Bullard v. Blue Hills Bank, 135 S. Ct. 1686, 1692, 1695 (2015). Orders confirming plans of reorganization are final for purposes of appeal. See Whaley v. Tennyson (In re Tennyson), 611 F.3d 873, 875 (11th Cir. 2010) (citation omitted); AmeriCredit Fin. Servs., Inc. v. Padgett (In re Padgett), 408 B.R. 374, 377 (B.A.P. 10th Cir. 2009) (citation omitted); In re D2 Abatement, Inc., No. 10-45074, 2010 WL 4961705, at *5 (Bankr. E.D. Mich. Aug. 9, 2010). In this circuit, however, orders denying requests for relief from the automatic stay are not necessarily final and appealable. See Raymond C. Green, Inc. v. DeGiacomo (In re Inofin, Inc.), 466 B.R. 170, 174 (B.A.P. 1st Cir. 2012); Caterpillar Fin. Servs. Corp. v. Braunstein (In re Henriquez), 261 B.R. 67, 70 (B.A.P. 1st Cir. 2001). Because the First Circuit Court of Appeals has rejected an absolute rule with respect to the finality of orders denying stay relief, see Pinpoint IT Servs., LLC v. Landrau Rivera (In re

---

[4] By the modification, the Debtor increased the amount of her plan payments to make up an arrearage asserted by the Trustee.

Atlas IT Exp. Corp.), 761 F.3d 177, 185 (1st Cir. 2014), the Panel ordered U.S. Bank to show cause why the appeal should not be dismissed as interlocutory. After due consideration of U.S. Bank's response, the Panel concluded that, while the Order Denying Stay Relief was indeed interlocutory, it nonetheless satisfied the criteria for discretionary review under 28 U.S.C. § 1292(b). Accordingly, the Panel accepted jurisdiction over the appeal of the Order Denying Stay Relief. Thus, we have jurisdiction over both orders on appeal.

## STANDARD OF REVIEW

The Panel reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Jeffrey P. White & Assocs., P.C. v. Fessenden (In re Wheaton), 547 B.R. 490, 496 (B.A.P. 1st Cir. 2016) (citation omitted). "Issues of statutory interpretation are reviewed *de novo*." In re LaPointe, 505 B.R. at 593 (citation omitted). The appeal of the Order Denying Stay Relief presents a question of law; so, too, does the appeal of the Confirmation Order. The applicable standard of review pertaining to both orders, therefore, is de novo. See id. (reviewing denial of stay relief de novo); see also Viegelahn v. Essex, 452 B.R. 195, 199 (W.D. Tex. 2011) (stating the standard of review for confirmation orders is de novo); Kronemyer v. Am. Contractors Indem. Co. (In re Kronemyer), 405 B.R. 915, 919 (B.A.P. 9th Cir. 2009) ("We review de novo contentions that present an issue of law regarding stay relief.") (citation omitted).

## DISCUSSION

This appeal presents us with the two-fold task of examining the legal principles governing the bankruptcy court's orders and determining the extent to which we are bound by our own court's precedent in reviewing those orders. We begin with the legal principles.

**I.    The Relevant Standards Regarding the Order Denying Stay Relief**

**A.    The Automatic Stay, Generally**

"Section 362(a)(1) provides that the filing of a bankruptcy petition automatically stays all acts against a debtor and property of the bankruptcy estate, subject to limited exceptions." In re LaPointe, 505 B.R. at 593 (citing 11 U.S.C. § 362(a)(1)).  "For property to be protected by the automatic stay, it must be property of the bankruptcy estate." Id. (citing 11 U.S.C. § 362(c)(1); Donarumo v. Furlong (In re Furlong), 660 F.3d 81, 89 (1st Cir. 2011)).  "Property of the bankruptcy estate includes all legal and equitable interests of the debtor in property as of the commencement of the case, subject to certain exceptions not applicable here." Id. (citing 11 U.S.C. § 541(a)(1)).  "Statutory or equitable rights of redemption are included in the concept of property of the estate under § 541." Id. (citing 4 Collier on Bankruptcy, § 541.04[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013)).  "Generally, state law determines whether the debtor has any legal or equitable interest in property that is included in the bankruptcy estate, unless federal law requires a different result." Id. (citing Butner v. United States, 440 U.S. 48, 55 (1979); NTA, LLC v. Concourse Holding Co. (In re NTA, LLC), 380 F.3d 523, 528 (1st Cir. 2004)).

**B.    Relief from the Automatic Stay**

Section 362(d) governs relief from the automatic stay.  That section provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property . . . , if—

> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(1) & (2).

In the First Circuit, "a hearing on a motion for relief from stay is merely a summary proceeding of limited effect, and . . . a court hearing a motion for relief from stay should seek only to determine whether the party seeking relief has *a colorable claim to property of the estate.*" Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 33 (1st Cir. 1994) (emphasis added). "A colorable claim is one that is legitimate and that may reasonably be asserted, given the facts presented and the current law . . . ." Jin Qing Li v. Rosen (In re Jin Qing Li), BAP No. NC-17-1062-STaB, 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018) (citation omitted) (internal quotation marks omitted). "This is a low threshold: 'A colorable claim (one seemingly valid and genuine) is not a difficult standard to meet.'" In re Pansier, No. 18-22297-beh, 2019 WL 1495100, at *4 (Bankr. E.D. Wis. Apr. 3, 2019) (citation omitted).

Here, U.S. Bank sought relief from the automatic stay pursuant to § 362(d)(1), the "for cause" provision, arguing that "[a]ny interest the Debtor may have had in the [P]roperty had already been extinguished prior to the creation of the bankruptcy estate and" was, therefore, "excluded" from it. In rendering its decision, the bankruptcy court did not reference § 362. Presumably, however, when the bankruptcy court concluded that the Debtor had a sufficient interest in the Property entitling her "to include a cure and maintain provision . . . in her Chapter 13 Plan[,]" 593 B.R. at 99, it implicitly determined that "cause" for granting relief from the automatic stay under that section was absent. Accordingly, we examine the correctness of that conclusion within the relevant legal framework.

## C.     New Hampshire Foreclosure Law

The foreclosure in this case was conducted pursuant to a power of sale clause in the parties' mortgage agreement.  N.H. Rev. Stat. Ann. §§ 479:25-28 govern power of sale foreclosures, and provide that upon a mortgage default, a mortgagee, after providing proper notice and complying with other requirements, may schedule a sale of the subject property.  See N.H. Rev. Stat. Ann. § 479:25.  N.H. Rev. Stat. Ann. § 479:26, entitled "Return; Effect," requires the seller to record the foreclosure deed, a copy of the notice of the sale, and the seller's affidavit within 60 days after the sale.  See N.H. Rev. Stat. Ann. § 479:26.  Failure to do so renders the sale void as to intervening encumbrances.  See id.  The statute provides:

> I. The person selling pursuant to the power shall within 60 days after the sale cause the foreclosure deed, a copy of the notice of the sale, and his affidavit setting forth fully and particularly his acts in the premises to be recorded in the registry of deeds in the county where the property is situated; and such affidavit or a duly certified copy of the record thereof shall be evidence on the question whether the power of sale was duly executed.  If such recording is prevented by order or stay of any court or law or any provision of the United States Bankruptcy Code, the time for such recording shall be extended until 10 days after the expiration or removal of such order or stay.  If such recording is, in accordance with the provisions of this chapter, made more than 60 days after the sale, the reasons therefor shall be set forth fully and particularly in the affidavit.
>
> II. Failure to record said deed and affidavit within 60 days after the sale shall render the sale void and of no effect only as to liens or other encumbrances of record with the register of deeds for said county intervening between the day of the sale and the time of recording of said deed and affidavit.
>
> III. Title to the foreclosed premises shall not pass to the purchaser until the time of the recording of the deed and affidavit.  Upon such recording, title to the premises shall pass to the purchaser free and clear of all interests and encumbrances which do not have priority over such mortgage.  In the event that the purchaser shall not pay the balance of the purchase price according to the terms of the sale, and at the option of the mortgagee, the down payment, if any, shall be forfeited and the foreclosure sale shall be void.

Id.

The mortgagor's state law redemption rights are set forth in N.H. Rev. Stat. Ann. § 479:18, which provides: "All lands conveyed in mortgage may be redeemed by the mortgagor . . . *before* foreclosure."  See N.H. Rev. Stat. Ann. § 479:18 (emphasis added).  With respect to the right of redemption, the New Hampshire Supreme Court held in a case that post-dated the enactment of Bankruptcy Code § 1322(c)(1):

> The mortgagor does not have a right of redemption *after* foreclosure.  RSA 479:18, :19 (1992).  *Even though legal title does not pass until the deed has been recorded, see RSA 479:26, II (1992), "this rule does not change the fact that [the debtor] possessed neither a legal nor an equitable interest in the property once the auctioneer's hammer fell and the memorandum of sale was signed."*  Abdelhaq v. Pflug, 82 B.R. 807, 810 (Bankr. E.D. Va. 1988); see In re Hazleton, 137 B.R. 560, 562 (Bankr. D.N.H. 1992).

Barrows v. Boles, 687 A.2d 979, 988 (N.H. 1996) (emphasis added).

## D.     The Bankruptcy Code's Cure Provisions—Section 1322

"Subsection 1322(b)(3) broadly permits [a chapter 13] plan to 'provide for the curing or waiving of any default' and subsection (b)(5) permits the plan to 'provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.'"  In re LaPointe, 505 B.R. at 594 (citing 11 U.S.C. § 1322(b)(3) and (5)).  Enacted in 1994, § 1322(c)(1) allows a debtor to cure his or her default under a home mortgage, notwithstanding the anti-modification provision of subsection (b)(2), under narrow circumstances:

> Notwithstanding subsection (b)(2) and applicable nonbankruptcy law . . . a default with respect to, or that gave rise to, a lien on the debtor's principal residence may

be cured . . . *until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law*[.]

11 U.S.C. § 1322(c)(1) (emphasis added). "Thus, under [§] 1322(b), a plan may provide for the cure of defaults, but if the default involves a lien on the debtor's principal residence, under [§] 1322(c)(1), the cure may only be made prior to the time that the property is sold at a foreclosure sale conducted in accordance with applicable nonbankruptcy law." McCarn v. WyHy Fed. Credit Union, 218 B.R. 154, 160 (B.A.P. 10th Cir. 1998).

### E.    Interpreting § 1322(c)(1)—In re LaPointe

The parties do not dispute that § 1322(c)(1) governs the outcome of this appeal. What they disagree about is what § 1322(c)(1) says. Indeed, since the statute's enactment, "courts have disagreed over the meaning of the phrase 'sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law,' and several different approaches have emerged." In re LaPointe, 505 B.R. at 595. Five years ago, our court confronted the question of § 1322(c)(1)'s interpretation as it related to a New Hampshire foreclosure in LaPointe. See id. at 592. There, the panel examined the split of authority regarding § 1322(c)(1)'s interpretation and in unequivocal terms adopted an interpretation that is at odds with the one adopted by the bankruptcy court below.

> One line of cases follows the "gavel rule," holding that the debtor's right to cure is cut off once the gavel falls at the foreclosure auction. These courts generally agree that § 1322(c)(1) is clear and unambiguous, and that the term "foreclosure sale" describes a "single, discrete event, and not merely a step in a process culminating in the recordation and delivery of a deed." In re Medaglia, 402 B.R. 530, 533 (Bankr. D.R.I. 2009) (citing [In re] Connors, 497 F.3d [314, 320 (3d Cir. 2007)]; Cain [v. Wells Fargo Bank, N.A. (In re Cain), 423 F.3d 617, 620 (6th Cir. 2005)]. According to these courts, the property is "sold" at the foreclosure auction, and the delivery of the deed, which customarily happens after the auction, is simply a ministerial act. Id. These courts also hold that the words "'conducted in accordance with applicable nonbankruptcy law' do not expand the

11

cure period according to state-law redemption rights, but rather describe[ ] a foreclosure sale conducted in compliance with (and not in violation of), relevant state law." Id. (citation omitted). Thus, "if the foreclosure sale did not violate applicable state law, it follows that when the gavel falls, the right to cure no longer exists." Id.

Courts adopting a second approach consider the statutory language to be ambiguous and turn to the legislative history to determine the legislature's intent. Courts following this approach focus on the word "sold" in § 1322(c)(1) and hold that the statutory language is intended to cut off the debtor's right to cure only when the entire sale transaction is complete under state law. They do not regard a "foreclosure sale" as an event, but instead, part of a process culminating in the delivery and recordation of the deed, with the debtor's right to cure surviving until title to the property passes to the purchaser under the relevant state law. The U.S. Bankruptcy Court for the District of New Hampshire adopted this approach in In re Beeman, a 1999 decision upon which the Debtor relies, and which the Bank argues was wrongly decided.

Id. at 595-96 (footnotes omitted).

We conclude that the language of § 1322(c)(1) is clear, unambiguous and needs no interpretation. "The phrase 'sold *at* a foreclosure sale' refers to a sale that occurs *at* a foreclosure auction." The additional phrase "conducted in accordance with applicable nonbankruptcy law" is a requirement that the foreclosure was noticed, convened and held in compliance with applicable state laws. "To define the word 'sold' as the point at which a deed is transferred to the prevailing bidder subsequent to the date of the auction likewise removes the words 'foreclosure sale' from the statute. . . .

Even if we were to conclude that § 1322(c)(1) is ambiguous and that we must look to state law to ascertain when a foreclosure sale "occurs" or is "final," it is clear that, under New Hampshire law, the foreclosure process is complete *as to the mortgagor* at the time the gavel falls at the foreclosure auction. See Barrows, 141 N.H. at 393, 687 A.2d 979; see also Calef v. Citibank, N.A., No. 11-cv-526-JL, 2013 WL 653951, at *5 (D.N.H. Feb. 21, 2013)[.]

Id. at 597 (citations omitted).

## II.      Whether the Bankruptcy Court or this Panel is Bound by LaPointe

There is disagreement among courts regarding the binding effect on bankruptcy courts of

bankruptcy appellate panel ("BAP") decisions. See Muskin, Inc. v. Indus. Steel Co. (In re

Muskin, Inc.), 151 B.R. 252, 254 (Bankr. N.D. Cal. 1993) (noting that caselaw regarding the

binding nature of bankruptcy appellate panel decisions is "wildly inconsistent"). In declining to follow BAP precedent, one bankruptcy court within this circuit recently stated "[t]he BAP's decisions must be given consideration as significant and persuasive authority, but there is no law definitively establishing that the decisions of the BAP are binding on bankruptcy courts within the First Circuit." In re Smith, 573 B.R. 298, 301 (Bankr. D. Me. 2017) (citing LBM Fin., LLC v. Shamus Holdings, Inc., No. 09-11668-FDS, 2010 WL 4181137 at *2 n.2 (D. Mass. Sept. 28, 2010), and In re Virden, 279 B.R. 401, 409 n.12 (Bankr. D. Mass. 2002)), aff'd 590 B.R. 1 (D. Me. 2018), aff'd, 910 F.3d 576 (1st Cir. 2018).

A related question is whether *we* are bound by prior decisions of *our* court. Although our First Circuit BAP has not declared as a formal jurisprudential rule that it is bound by its prior decisions, it has acknowledged that "fidelity" to precedent "promotes 'stability, predictability, and respect for judicial authority.'"[5] Gentile v. DeGiacomo (In re Gentile), 492 B.R. 580, 585 (B.A.P. 1st Cir. 2013) (quoting Gately v. Commonwealth of Mass., 2 F.3d 1221, 1226 (1st Cir. 1993)); see also Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co., 215 F.3d 136, 142 (1st Cir. 2000) ("We value finality, stability, and certainty in the law, particularly in the field of statutory construction.") (citation omitted). Indeed, such stability was the impetus for the creation of BAPs. See Bank of Maui v. Estate Analysis, Inc, 904 F.2d 470, 472 (9th Cir. 1990) (O'Scannlain, concurring).

---

[5] In contrast, the Ninth Circuit BAP has stated that it is bound to follow its own precedent. See Hernandez v. Hopper (In re Hernandez), No. 12-24502, 2013 WL 1490995, at *8 (B.A.P. 9th Cir. Apr. 11, 2013).

The U.S. Court of Appeals for the First Circuit has stated that it is bound by its earlier decisions, "unless an exception exists to the principles of stare decisis." United States v. Rodriguez-Pacheco, 475 F.3d 434, 441 (1st Cir. 2007) (citation omitted). It explained:

> The doctrine of stare decisis provides that courts must abide by or adhere to cases that have been previously decided and that a legal decision on an issue of law that is contained in a final judgment is binding in all future cases on the court that made the legal decision and all other courts that owe obedience to that court. In other words, the doctrine of stare decisis incorporates two principles: (1) a court is bound by its own prior legal decisions unless there are substantial reasons to abandon a decision; and (2) a legal decision rendered by a court will be followed by all courts inferior to it in the judicial system.

Id. (quoting 3 J. Moore et al., Moore's Manual—Federal Practice and Procedure § 30.10[1] (2006)). The First Circuit recognizes two exceptions to the stare decisis rule: (1) when an existing decision is "undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court, an en banc opinion of the circuit court, or a statutory overruling"; and (2) when "authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind." Id. at 441-42 (citations omitted) (internal quotation marks omitted).

Stare decisis considerations support our adherence to LaPointe. Neither the Supreme Court nor the First Circuit has issued a decision which overrules or undermines LaPointe. Since LaPointe's issuance, the bankruptcy court's decision in Vertullo is the only published decision criticizing LaPointe. Nevertheless, it does not offer a sound reason for us to conclude that the LaPointe panel would have changed its collective mind in light of fresh developments dealt with by the bankruptcy court. A review generally of case law post-dating LaPointe yields no compelling reason for this Panel to reverse the position expressed in LaPointe. Furthermore, an

14

examination of relevant statutory authority reveals no change which might prompt a departure from the holding in LaPointe. Accordingly, there is no reason for this Panel to depart from our BAP's own precedent on the issue that controls the outcome of this appeal.

Traditional principles of stare decisis aside, we turn our attention to a concurrence in a Ninth Circuit BAP decision which identified another circumstance when a BAP should "change or alter [its] prior precedent"—namely, when a subsequent panel thinks the precedent is "dead wrong." In re Brooks-Hamilton, 400 B.R. 238, 256 (B.A.P. 9th Cir. 2009) (Markell, concurring). The Brooks-Hamilton concurrence reasoned: "Although adherence to precedent is a venerable ideal, experience shows that it is unwise to enshrine precedent and never reconsider it." Id. (footnote omitted). Indeed, the First Circuit similarly instructs that "*stare decisis* is neither a straightjacket nor an immutable rule; it leaves room for courts to . . . make informed judgments as to whether earlier decisions retain preclusive force." Carpenters Local Union No., 215 F.3d at 142. With this in mind, we revisit LaPointe to determine whether there is any justification beyond the principles of stare decisis for departing from it; or put another way, whether LaPointe was "dead wrong."

## III.    Assessing LaPointe

The bankruptcy court found fault with three aspects of the LaPointe analysis. We address those criticisms to assess whether the LaPointe panel made a mistake, as the court below suggests.

### A.    Whether the LaPointe Panel "Misread" Beeman

The bankruptcy court stated:

[I]t was incorrect [for the Panel] to conclude that Beeman "adopted this [second] approach," which the [P]anel defined as an approach that considers "the statutory

15

language to be ambiguous." [ ] It is unambiguously clear that <u>Beeman</u> did not find the language of § 1322(c)(1) to be ambiguous[.]

In re Vertullo, 593 B.R. at 97-98 (quoting <u>Beeman</u>, 235 B.R. at 524). This purported "misreading of <u>Beeman</u>," the bankruptcy court opined, "fogs the rest of" the <u>LaPointe</u> panel's legal analysis. <u>Id.</u> at 98.

A close reading of <u>LaPointe</u>, however, reveals that the <u>LaPointe</u> panel never stated that the <u>Beeman</u> court found § 1322(c)(1) to be ambiguous. On the contrary, <u>LaPointe</u> explicitly observed that the <u>Beeman</u> court "[a]nalyze[d] what it considered to be the *plain language* of § 1322[.]" <u>In re LaPointe</u>, 505 B.R. at 596 (emphasis added). In describing the approach of the <u>Beeman</u> court, the <u>Lapointe</u> panel accurately explained that <u>Beeman</u> followed the approach of those courts which conclude that a foreclosure sale is a process and not an event. <u>See id.</u> at 595-96.

**B.      Whether the <u>LaPointe</u> Panel's Legal Reasoning is "Problematic"**

The bankruptcy court challenged the meaning the <u>LaPointe</u> panel ascribed to two phrases contained within § 1322(c)(1): "foreclosure sale" and "conducted in accordance with applicable nonbankruptcy law":

> [T]he Court finds the <u>LaPointe</u> decision's legal reasoning to be problematic. <u>LaPointe</u> concludes that "foreclosure sale" really means "foreclosure auction" and that the last phrase of § 1322(c)(1), "conducted in accordance with applicable nonbankruptcy law," means only that the "auction" complied with that state law. In coming to this conclusion, the <u>LaPointe</u> panel seems to make the very same error it found in <u>Beeman</u>. It has effectively read the phrase "foreclosure sale" out of the statute and substituted it with "foreclosure auction." This substitution necessarily narrows the scope of the sentence, as "auction" is a more specific term than "sale." <u>See Beeman</u>, 235 B.R. at 525 ("Thus, the statutory language envisions a debtor's rights being terminated upon the completed transfer of title and ownership to a buyer through a foreclosure sale. Title and ownership generally pass through foreclosure upon the completion of a process, and not

16

upon the occurrence of a single event such as a foreclosure auction."). The Court finds the meaning of § 1322(c)(1) clear without any paraphrasing or glossing of terms.

In re Vertullo, 593 B.R. at 98 (citation omitted).

### 1. The Plain Language of the Statute

We discern no error either in the parsing of § 1322(c)(1) into two phrases or in the meaning LaPointe gave those phrases. The Bankruptcy Code does not define "foreclosure sale." "In the absence of a specific statutory definition, the language of the statute should be given its ordinary meaning and construed in a common sense manner . . . ." Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 171 F.3d 818, 822 (3d Cir. 1999) (citation omitted) (internal quotation marks omitted) (interpreting a different statute). The task of determining the meaning of § 1322(c)(1) therefore "begins where all such inquiries must begin: with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (addressing a different statute, § 506(b)). "In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." Id. (citation omitted) (internal quotation marks omitted).

We agree that § 1322(c)(1) "is most logically read in two parts, so that the debtor's right to cure ends '[1] when the residence is sold at a foreclosure sale [2] that is conducted in accordance with applicable nonbankruptcy law.'" In re Crawford, 232 B.R. 92, 96 (Bankr. N.D. Ohio 1999) (citation omitted) (like LaPointe, dissecting the statute into two parts). Giving the words of the statute's two parts their ordinary, common sense meaning supports the LaPointe panel's conclusion that (1) "foreclosure sale" references a discrete event, the foreclosure auction; and (2) "conducted in accordance with applicable nonbankruptcy law" refers to a foreclosure

17

sale that complies with state law procedures. See Connors, 497 F.3d at 319. Indeed, the dictionary definition of "sale" includes "public disposal to the highest bidder." Sale Definition, Merriam-Webster.com, https://www.merriam-webster.com/browse/sale (last visited January 10, 2020). Conspicuously absent from the language of the statute is any language that would indicate that the mortgagor's redemption rights terminate upon recordation of the foreclosure deed.

### 2.      The Gavel Rule Represents the Majority View

Despite the bankruptcy court's criticism, LaPointe's interpretation of § 1322(c)(1)'s phraseology represents the majority view. See In re Medaglia, 402 B.R. at 532. Moreover, LaPointe is consistent with the decisions of two circuit courts of appeals—namely, the Seventh and Third Circuits. See Connors, 497 F.3d at 321 (concluding that "a residence is 'sold' at the foreclosure auction" and "a foreclosure sale conducted in accordance with applicable nonbankruptcy law" "clearly refers to a foreclosure sale that complies with state-law procedures"); In re Cain, 423 F.3d at 621 (§ 1322(c)(1) terminates a debtor's right to cure a home mortgage default "when the gavel comes down on the last bid at the foreclosure sale") (citation omitted) (internal quotation marks omitted). Additionally, numerous district courts and bankruptcy courts (including the bankruptcy courts for the districts of Massachusetts, Rhode Island, and Maine) agree that a "straightforward reading" of the statute compels the conclusion that: (1) the phrase, "sold at a foreclosure sale," means "the cut-off point is when the gavel comes down on the last bid at the foreclosure sale"; and (2) the phrase, "that is conducted in

accordance with applicable nonbankruptcy law," qualifies "foreclosure sale" and requires the

sale to be carried out as provided for by nonbankruptcy law. In re Crawford, 232 B.R. at 96.[6]

A number of gavel rule cases offer particularly insightful reasoning and warrant lengthy

quotation to demonstrate that, far from being "dead wrong," LaPointe was correct in adopting the

gavel rule. Within our own circuit, Medaglia's reasoning in support of the "gavel rule" and its

attendant definition of "foreclosure sale" is especially persuasive:

> This Court is most comfortable adopting the majority view on the ground that the language of the statute is clear, unambiguous, and needs no interpretation. I also agree that the term "foreclosure sale" describes a single, discrete event, and not merely a step in a process culminating in the recordation and delivery of a deed. Connors, 497 F.3d at 320; Cain, 423 F.3d at 620. It is not, I think, an extreme position to take, i.e., that the property is *sold* at the foreclosure sale, and that the deed is customarily not delivered to the purchaser until after the foreclosure sale. Connors, [497 F.3d] at 320-321. The delivery of a foreclosure deed has been described as a "ministerial act, routinely performed, which does not affect the redemption rights of the parties." Id. at 321 (citation omitted). Further, the words "conducted in accordance with applicable nonbankruptcy law" do not expand the cure period according to state-law redemption rights, but rather describe[ ] a foreclosure sale conducted in compliance with (and not in violation of), relevant state law. Connors, 497 F.3d at 391; Cain, 423 F.3d at 620.
>
> Nowhere does the statute require that the cure rights under [§] 1322 terminate only upon the recordation and delivery of the foreclosure deed. Such language is not part of the statute, and it is not within the Court's authority to read the statute as though it were in there. "To define the word 'sold' as the point at which a deed is transferred to the prevailing bidder subsequent to the date of the auction . . .

---

[6] See also In re Richter, 525 B.R. 735, 744 (Bankr. C.D. Cal. 2015); In re Medaglia, 402 B.R. at 533; JPMorgan Chase Bank v. McKinney (In re McKinney), 344 B.R. 1, 5 (Bankr. D. Me. 2006); In re Crichlow, 322 B.R. 229, 234 (Bankr. D. Mass. 2004) ("The phrase 'sold at a foreclosure sale' refers to the sale that occurs at a foreclosure auction not pursuant to or after."); In re McCarn, 218 B.R. at 160; In re Hric, 208 B.R. 21, 26 (Bankr. D.N.J. 1997) ("[T]he phrase 'sold at a foreclosure sale'. . . refers to the auction itself . . . ."); Cottrell v. United States (In re Cottrell), 213 B.R. 378, 381 (Bankr. M.D. Ala. 1996); In re Simmons, 202 B.R. 198, 202-03 (Bankr. D.N.J. 1996) ("[I]t is reasonable to assume that Congress used the term foreclosure sale in its customary sense.") (citation omitted); Krawczyk v. United States (In re Krawczyk), 201 B.R. 589, 591 (Bankr. N.D. Ga. 1996); In re Little, 201 B.R. 98, 107 (Bankr. D.N.J. 1996); In re Sims, 185 B.R. 853, 864-66 (Bankr. N.D. Ala. 1995) (§ 1322(c)(1) clearly and unambiguously set a bright-line date, the date of the actual foreclosure sale, as the cut-off to cure a default under a mortgage).

removes the words 'foreclosure sale' from the statute." Crichlow, 322 B.R. at 234. Therefore, if the foreclosure sale did not violate applicable state law, it follows that when the gavel falls, the right to cure no longer exists.

402 B.R. at 533.

Turning to the statute's plain meaning as well as the language of other Bankruptcy Code provisions, the bankruptcy court for the District of Columbia also offered compelling support for the "gavel rule":

Common parlance draws a distinction between the property being "sold at a foreclosure sale" and the later consummation of that sale and satisfaction of all contingencies required to prevent defeasance of the sale (such as any required court approval of the sale, or expiration of any right of cure that exists after the sale and prior to court approval of the sale, or expiration of any right of redemption). . . . Moreover, this interpretation of § 1322(c)(1) is appropriate in light of Congress having drawn a distinction elsewhere in the Bankruptcy Code between property being sold at a sale and the later consummation of that sale. The drawing of the distinction is found in [ ] § 363(k) which provides:

(k) *At a sale* under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, *if the holder* of such claim *purchases* such property, *such holder may offset* such claim *against the purchase price* of such property.

[Emphasis added.] Congress used the term "sale" as meaning the bidding process—not the later consummation of the sale—whereby the property is sold at the § 363 sale to the highest bidder. Section 363(k) contemplates that the act of purchasing the property (via being the high bidder) "at such sale" is distinct from the later act of paying the purchase price (via offsetting the secured creditor's claim against the price at which the property was sold). In other words, § 363(k) makes clear that a "sale" is the process of bidding off the property, not the later process of consummating the successful bidder's purchase of the property. Once the term "foreclosure sale" is properly construed to mean the bidding process— usually taking the form of a public auction—the phrase "sold at a foreclosure sale" connotes that the bidding has concluded with an entity purchasing the property as a result of being the highest bidder; it does not connote the later time when that purchaser consummates the sale by paying the consideration and

20

receiving a deed transferring title. Once there is a highest bidder obligated to perform (subject only to any required court approval of the sale), the property has been sold at a foreclosure sale.

In re Bobo, 246 B.R. 453, 456-57 (Bankr. D.D.C. 2000).

In addition to the above-mentioned courts, the Tenth Circuit BAP also provided a convincing policy rationale for interpreting the date of the foreclosure sale as the date that a debtor's right to cure is cut off:

> Finding that a debtor's ability to cure a mortgage default under [§] 1322(b) is terminated under [§] 1322(c)(1) on the date of a foreclosure sale is in accord with the policy of establishing a uniform set of laws governing consumer bankruptcy. It also does not offend the goals of chapter 13 of affording wage earners an opportunity to retain their homes while at the same time providing certain protections to mortgagees. Prior to any foreclosure sale, debtors must be given notice of the sale. By the time of the sale, therefore, the debtors have had a reasonable opportunity to retain their residence by filing chapter 13 and proposing a plan to cure any defaults under their mortgage.

In re McCarn, 218 B.R. at 160 (citations omitted).

Perhaps the Third Circuit said it best in Connors:

> Some courts have found ambiguity in the phrase, "that is conducted in accordance with applicable nonbankruptcy law." . . . We are unpersuaded that the phrase is ambiguous; indeed, to find ambiguity would be to deny the words their plain meaning. The word "that" is a relative pronoun that restricts and, therefore, modifies, the preceding noun, "foreclosure sale." Thus, when the statute refers to "a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law," it clearly refers to a foreclosure sale that complies with state-law procedures. See New Castle County v. Hartford Acc. & Indem. Co., 970 F.2d 1267, 1270 (3d Cir. 1992) ("[T]he question is not whether there is an ambiguity in the metaphysical sense, but whether the language has only one reasonable meaning when construed, not in a hypertechnical fashion, but in an ordinary, common sense manner."). We agree with those decisions that have reached this conclusion without resorting to legislative history. See, e.g., Cain, 423 F.3d at 620; Hric, 208 B.R. at 25; see also Simmons, 202 B.R. at 203 (finding that canons of statutory construction, as well as "common sense," mandated the same reading, but also considering legislative history).
>
> We must also determine what it means for a residence to be "sold at a foreclosure sale." Deconstructing this phrase further, we must determine the meaning of

"foreclosure sale"—a term that Appellees contend is synonymous with the foreclosure auction, but that Connors insists refers to the entire foreclosure process, terminating with the delivery of a deed. The Bankruptcy Code does not define "foreclosure sale," so we must give it its ordinary meaning. Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 171 F.3d 818, 822 (3d Cir. 1999).

Outside of cases applying the deed-delivery rule, the term "foreclosure sale" is broadly understood to mean the foreclosure auction. First, the preposition "at" in "sold at a foreclosure sale" signifies a discrete event, rather than an ongoing process. See Chisolm, 2005 WL 1522232, at *3. . . . There is no doubt that "foreclosure sale," as it is commonly understood, signifies the foreclosure auction. See, e.g., Cain, 423 F.3d at 620; Hric, 208 B.R. at 25; Simmons, 202 B.R. at 203.

497 F.3d at 319-20 (footnote omitted).

The above-cited cases highlighting the majority view provide sound reasons for concluding, as the LaPointe panel did, that a debtor's interest in foreclosed property and, hence, her right to cure, ends when the gavel falls. These cases uniformly point to the well-established rule of statutory construction, the plain language rule, to support this conclusion. In addition, other compelling considerations that emerge from the case law include the need for a uniform set of laws governing consumer bankruptcy, In re McCarn, 218 B.R. at 160, and internal consistency within the Bankruptcy Code itself, In re Bobo, 246 B.R. at 456-57. There is no support for a conclusion that the LaPointe's reasoning was "problematic" or that LaPointe was "dead wrong," such that its decision should not be followed by this Panel. Moreover, other than Vertullo, there have been no cases issued by courts at any level rejecting the holding in LaPointe.

In light of LaPointe and the majority of cases that are consistent with LaPointe, it is safe to say that U.S. Bank satisfied its burden of establishing a colorable claim to the Property. See Grella, 42 F.3d at 33. Applying LaPointe, we conclude that, because the Debtor did not have the right to cure her default under the Plan, cause existed to lift the stay. The Order Denying Stay Relief is, therefore, **REVERSED**.

22

**IV.    The Plan Confirmation Order**

Section 1325 governs confirmation of the chapter 13 plans.  See 11 U.S.C. § 1325; see also In re Rosencranz, 193 B.R. 629, 635 (Bankr. D. Mass. 1996).  That section provides, in part:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> > (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title[.]

11 U.S.C. § 1325(a)(1).  Here, the Plan was not confirmable pursuant to § 1325(a)(1) because, as discussed above, the Debtor lost her right to cure under § 1322(c)(1) at the conclusion of the foreclosure sale.[7]  See In re Parker, 563 B.R. 650, 655 (Bankr. E.D. Ky. 2017) (sustaining objection to confirmation under § 1325(a)(3) where chapter 13 plan proposed to cure a default in violation of § 1322(c)(1)).  Therefore, the Confirmation Order is also **REVERSED**.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the Order Denying Stay Relief and the Confirmation Order and **REMAND** to the bankruptcy court for further proceedings consistent with our decision.

---

[7]  The bankruptcy court did not reference § 1325 in its analysis.  Presumably, however, in confirming the Plan, the bankruptcy court determined that it satisfied the requirements of § 1325.

23